Matthew T. Christensen, ISB: 7213
Chad R. Moody, ISB: 9946
ANGSTMAN JOHNSON
199 N. Capitol Blvd, Ste 200
Boise, ID 83702
Phone: (208) 384-8588
Fax: (208) 853-0117
Email: mtc@angstman.com
       chad@angstman.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>TIMOTHY D. SEMONES and SUSAN C. DESKO,<br><br>               Debtors. | Case No. 19-40057-JMM<br>Chapter 11 |

**FIFTH AMENDED DISCLOSURE STATEMENT**

**I.**
**INTRODUCTION**

This is the Fifth Amended Disclosure Statement (the "Disclosure Statement") in the chapter 11 case of **Timothy D. Semones ("Semones") and Susan C. Desko ("Desko")** (the "Debtors"). This Disclosure Statement contains information about the Debtors and describes the proposed Fourth Amended Chapter 11 Reorganization Plan (the "Plan"), dated December 14, 2020.   A full copy of the proposed Plan is attached to this Disclosure Statement as ***Exhibit A***.  ***Your rights may be affected.  You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney.  If you do not have an attorney, you may wish to consult one.***

The proposed distributions under the Plan are discussed at pages 7-12 of this Disclosure Statement.   General unsecured creditors are classified in Class 8 and will likely receive a distribution of 100 % of their allowed claims.

### A.    Purpose of This Document

This Disclosure Statement describes:

- The Debtors and significant events prior to or during the bankruptcy case;
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed);
- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- Why the Debtors believe the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation; and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

### B.    Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement.  This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Time and Place of the Hearing to Finally Approve This Disclosure Statement and Confirm the Plan*

The hearings at which the Court will determine whether to finally approve this Disclosure Statement and confirm the Plan will take place at the Federal Courthouse located at 550 W. Fort Street, Courtroom 4, Boise, Idaho, 83724, on dates to be set hereafter.  The hearings may be either in person, via telephone conference, or via videoconference.  Notice of both hearings shall be given in accordance with Fed. R. Bankr. Proc. 3017.

2.    *Deadline For Voting to Accept or Reject the Plan*

Only votes of classes of claimants (creditors) which are impaired by the Plan are counted in connection with the confirmation of the plan.  In this case, most (if not all) creditors are impaired and therefore are expected to vote on the Plan.  Some of the impaired creditors are expected to vote in favor of the plan.

3.    *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Matthew T. Christensen, Attorney for the Debtors, 199 N. Capitol Blvd, Ste 200, Boise, ID 83702.

**C.    Disclaimer**

***The Court has not yet approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms.  The Court has not yet determined whether the Plan meets the legal requirements for confirmation.  If the Court approves this Disclosure Statement, that does not constitute endorsement of the Plan by the Court, or a recommendation that it be accepted.***

## II.
## BACKGROUND

**A.    History**

Tim Semones graduated from high school in Virginia in 1977.  He received a Bachelor of Electrical Engineering from Georgia Institute of Technology and a Masters in Business Administration from University of California Los Angeles.  He has worked in engineering and business roles since graduation in 1981.  Susan Desko graduated from high school in Georgia in 1978.  She received a Bachelor of Science in Architecture from Georgia Institute of Technology

and a Masters in Architecture from Harvard University. She been a practicing architect since 1982, a member of the American Institute of Architects and is a licensed architect in Idaho.

Tim worked for Hewlett Packard Company initially after graduation and has worked with various technology companies such as MindSpring, Earthlink, and Inphi. Tim is now self-employed as Principal at SD Consulting, LLC. The company provides valuation and technology consulting services. Susan worked for an architectural and engineering services firm in Atlanta upon graduation and worked for other architecture firms prior to opening her own practice in 1998. Her architecture practice is pursued through Susan Desko PC, d/b/a Architect Susan Desko.

Inphi Partners LLC is a single purpose, single asset LLC organized to develop real estate on Lake Creek Drive in Ketchum, Idaho. Tim Semones is the sole and managing member of Inphi Partners LLC. Inphi Partners LLC borrowed, with Tim Semones as personal guarantor, construction and development funds for the project, including property located at 29 Lake Creek Drive. Over time, debts became due to Banatao Living Trust. These debts were secured by a Deed of Trust granted by Inphi Partners to Banatao Living Trust, which was recorded in July 2006. Over time, additional construction funds were needed, and the new lender required a first-position Deed of Trust. In order to facilitate the lending, Banatao Living Trust agreed to release its lien based on Inphi Partners' promise that it would be repaid from the proceeds of the sale of the 29 Lake Creek Property. (Banatao Living Trust also held a personal guarantee from Tim Semones.) The loans to fund construction of the Lake Creek property were refinanced multiple times and eventually became in excess of what the property could be sold for. In some cases, depending on the lenders, the loan funds would be received directly by the Debtors, but used by Inphi Partners, LLC, to fund the construction. At the time of filing the bankruptcy petition, the Debtors still had loan proceeds in their individual accounts, which continued to be transferred to Inphi Partners, LLC, in the

ordinary course of developing the 29 Lake Creek property. Additionally, after funds were borrowed from Eta Compute, Inc.[1], for the construction, Eta Compute, Inc., initiated a lawsuit against Semones, Desko, Inphi Partners and Susan Desko PC, alleging that the funds borrowed from Eta Compute had been improperly taken without authorization. This District Court lawsuit by Eta Compute, Inc., prompted the need for the Chapter 11 reorganization.

### B. Significant Events during the Bankruptcy Case

At the time the bankruptcy case was originally filed, the Debtors also sought an injunction through an Adversary Proceeding against Eta Compute, Inc. (*see* Adv. Case No. 19-08013-JMM), seeking a stay of federal District Court litigation against the Debtors and their two companies, Inphi Partners, LLC, and Susan Desko, P.C. Through negotiation with Eta Compute, Inc., the Debtors successfully obtained a stay of the District Court proceeding, and Inphi Partners granted a second-position lien to Eta Compute, Inc., on property located at 29 Lake Creek. This was the property that Inphi Partners owned, that the Eta Compute funds were used to complete construction on. Eta Compute had pursued claims against the Debtors and both companies (Inphi Partners and Susan Desko, P.C.), alleging that the actual funds had been transferred to the company accounts (not the Debtors). Due to the resolution, that adversary proceeding was dismissed.

Additionally, Eta Compute, Inc., pursued a nondischargeability proceeding against the Debtors, seeking to deny a discharge of the Debtors' individual liability on any Eta Compute, Inc., debt. That adversary proceeding also resulted in a compromise related to the sale of the 29 Lake Creek property. Through the compromise, Eta Compute, Inc., received certain stock held by the Debtors (the stock was Eta Compute, Inc., shares) and also received $1,300,000.00 from the sale

---

[1] Eta Compute, Inc., disputed that funds were borrowed, and previously pursued claims that the funds were misappropriated by Semones. Those claims were the subject of a nondischargeability adversary proceeding. However, via compromise related to the sale of the 29 Lake Creek property, Eta Compute was fully repaid and has released any further liability against Semones or Desko.

FIFTH AMENDED DISCLOSURE STATEMENT – Page 5

of the Lake Creek property owned by Inphi Partners (on which a lien had previously been granted to Eta Compute by Inphi Partners). In return, Eta Compute released all further claims against the Debtors and their companies (including Inphi Partners, who owned the Lake Creek property, and received a release of the Eta Compute Deed of Trust upon the sale of that property).

At the time the bankruptcy petition was filed, the Debtors still held loan funds in their personal accounts related to the construction of the 29 Lake Creek property. As construction on that property continued post-petition, the Debtors transferred those loan proceeds to Inphi Partners, LLC (a wholly-owned single asset company), for purposes of paying those construction costs. This same procedure existed pre-petition and was the ordinary course of business for the Debtors when loan funds were received by them personally. Because this was the ordinary practice of the Debtors to pay the normal construction costs, they were not required to seek bankruptcy court approval to continue this method of using the loan funds for the intended purpose – construction of the 29 Lake Creek property.

After the 29 Lake Creek property was originally under contract for a sale price of $5,000,000.00, the United States Attorney's office sought and obtained a criminal grand jury indictment against Timothy Semones, alleging fraud related to the funds borrowed from Eta Compute. This indictment was served (and an arrest made) on Tim Semones at the exact moment he was meeting the buyer of the 29 Lake Creek property to inspect the property as part of the buyer's due diligence. Shortly thereafter, the buyer rescinded his offer. Semones was later able to get the buyer to make a new offer, but for a drastically reduced price (ultimate sale price was $4,112,500.00 – a reduction of $887,500.00 from the original sale price). The sale was ultimately closed, and net proceeds of $191,841.54 are currently being held by the U.S. Marshal subject to

forfeiture proceedings.  The U.S. Attorney for the District of Idaho has refused to release the funds or otherwise allow them to benefit Semones or Desko in any way.

Tim Semones' criminal case remains ongoing.  The U.S. Marshal service is holding the proceeds of the 29 Lake Creek sale pending further order from the court in the forfeiture proceeding.  The Debtors and Banatao Living Trust have worked with the U.S. Attorney to release the funds.  To date, the U.S. Attorney has refused to agree to release the funds to the Debtors directly.  Indeed, the District Court entered an order confirming the forfeiture of those funds by the Debtors (but the funds are still subject to claims of third parties – such as Banatao Living Trust).  However, the AUSA has agreed that, if Banatao Living Trust can show that it was a victim of the alleged fraud related to the Eta Compute funds, he will agree that Banatao Living Trust can receive the U.S. Marshal funds.  Further, Banatao Living Trust also may pursue the funds through formal forfeiture proceedings.  The Debtors have committed to assist Banatao Living Trust in these efforts.  Tim Semones pled guilty to the criminal charges.  A sentencing hearing is currently set for January 15, 2021.  A Pre-sentencing report was filed by the U.S. Attorney.  A copy of that pre-sentence report is attached hereto as ***Exhibit G***.  The Debtor has not yet filed a pre-sentence report in the criminal case, but disputes most of the information presented by the U.S. Attorney.  Semones is seeking a prison sentence of home confinement to allow him to continue consulting work and income to repay creditors.

### A.  Projected Recovery of Avoidable Transfers

The Debtors have investigated prepetition transactions.  If a creditor received a payment or other transfer within 90 days of the bankruptcy, or other transfer avoidable under the Code, the Debtors may seek to avoid such transfer.  However, the Debtors and counsel have reviewed the potential preference transfers and believe that most of them are defensible as "ordinary course of

business" transactions and or would be uncollectible.  Additionally, the Debtors have reviewed potential pre-petition fraudulent transfers, and do not believe any potential fraudulent transfer claim exist and/or that any such claims would be uncollectible against the potential defendants. The Debtors do not wish to pursue these claims and add substantial cost, expense and time to the consummation of this case.

### B.    Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtors reserve the right to object to claims.  Therefore, even if a claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article 11 of the Plan.

### C.    Current and Historical Financial Conditions

The identity and fair market value of the estate's assets are listed in the Debtors' schedules (as amended) in the Debtors' bankruptcy case and the documents filed with this disclosure and proposed plan.

The Debtors do not possess a recent financial statement issued before bankruptcy, and therefore none are present here.

The most recent post-petition operating report filed since the commencement of the Debtors' bankruptcy case is set forth in ***Exhibit B***, attached hereto.[2] Additionally, the Debtors own

---

[2] In an effort to save paper and reduce waste, the monthly operating report attached hereto does not include the bank statements or reconciliation pages included with the original operating report.  A full copy of the monthly operating report can be provided upon request.

FIFTH AMENDED DISCLOSURE STATEMENT – Page 8

certain companies.  The Debtors' most recent Rule 2015.3 report regarding the values of their company interests is set forth in ***Exhibit E***, attached hereto.

The Debtors' projected income for the twelve-month period after filing the Chapter 11 Plan is shown on ***Exhibit C***, attached hereto.

## III.

## CLASSIFICATION OF CLAIMS

Debtors' Plan of Reorganization establishes eight classes for claims and provides for treatment of administrative expenses.  Those classes are:

1. Secured Claim of Wells Fargo Bank (secured by first-position lien on real property located at 105 Madison Ave)
2. Secured Claim of Wells Fargo Bank (secured by second-position lien on real property located at 105 Madison Ave)
3. Secured Claim of Wells Fargo Auto Finance (secured by first-position lien on 2005 Mercedes)
4. Secured Claim of United Bridge Capital (unsecured as to Debtors, but secured by first-position lien on real property located at 29 Lake Creek)
5. Secured Claim of Eta Compute, Inc. (unsecured as to Debtors, but secured by second-position lien on real property located at 29 Lake Creek)
6. Claims for Priority Taxes
7. Previously-secured claim of Banatao Living Trust
8. General Unsecured Claims (excluding Banatao Living Trust)

## IV.

## ANALYSIS OF PLAN

Administrative expenses are the costs incurred in filing and prosecuting a chapter 11 Amended Plan, as defined in 11 U.S.C. §503(b) of the United States Code (the "Bankruptcy Code").  They generally include expenses, as allowed by the U.S. Bankruptcy Court, for the actual necessary costs and expenses of preserving the estate, costs and fees of professionals such as the Debtors' bankruptcy attorney, accountant, and sometimes other professionals.

The Debtors must seek approval of employment of professionals, including attorneys, accountants and real estate brokers, that they use in a chapter 11 case.  The Debtors are prohibited from paying a professional for services rendered to the Debtors, unless the Court does approve the professional's employment.

The Bankruptcy Court reviews and approves compensation for professionals, in such amounts as it believes appropriate, based upon its analysis of the time and expenses incurred, and factors included in the bankruptcy code.  Before the bankruptcy court will decide the appropriate amount, the Debtors will serve on all interested parties a notice of an application for approval of compensation which will provide the amount of compensation sought and the time limits for requesting a hearing.

The Debtors sought and received approval to employ attorneys in this case, Angstman Johnson ("AJ").  As of the filing of this Disclosure Statement, AJ held funds in a client retainer account.  In the event AJ's fees and costs are approved by the Court, the Debtors shall pay said fees and costs from funds in the client trust account, funds on hand or in bank accounts at the time of confirmation.  In the event the Debtors do not have funds on hand or in bank accounts at the time of confirmation in order to pay AJ's fees and costs, the Debtors will pay the professional fees and costs as outlined on the twelve-month projections (i.e., $1000 per month) until those fees and costs are paid in full.  If the Debtors have fees and costs due to more than one professional, each shall share pro rata in the payments until all such fees and costs are paid in full.  These fees and costs shall be paid in full before any payment is due or is made to the IRS or the State Tax Commission on their unsecured claims, or to any other unsecured claim.  *See 11 U.S.C. §1129(a)(9)*.

FIFTH AMENDED DISCLOSURE STATEMENT – Page 10

To the extent that Debtors do pay an allowed administrative expense, the payment to priority tax claims and/or unsecured creditors will be delayed.  Payment amounts to general unsecured creditors will not be reduced by any amount paid to administrative or priority creditors.

Pursuant to 28 U.S.C. § 1930(a)(6), the Debtors are obligated to pay quarterly fees to the United States Trustee during pendency of the chapter 11 case until a Plan is confirmed and the estate is closed.  The United States Trustee's quarterly fees are an administrative expense which shall be paid by virtue of 11 U.S.C. § 1129(a)(12).  The Debtors shall pay, when due, all allowed quarterly fees incurred from the date of confirmation until the case is closed by the Court, converted or dismissed, whichever occurs first.  The Debtors currently dispute certain fees assessed by the U.S. Trustee related to disbursements by Inphi Partners to Eta Compute related to the closing of the sale of the 29 Lake Creek property.  Those disputed U.S. Trustee fees will be paid once allowed by the Court.  The disputed fees are approximately $10,000.00.  The Debtors anticipate a resolution of this issue prior to the confirmation hearing in this case.

The Debtors propose to treat the classes as follows:

CLASS 1:    This class consists of a secured claim by Wells Fargo Home Mortgage in the approximate amount of $459,400.00.  This claim is secured by a first-position lien on the Debtors' residence.  The Debtors participated in payment forebearance allowed by Wells Fargo as a result of the COVID-19 virus.  The treatment of this Class 1 Claim of Wells Fargo will be pursuant that Claim Stipulation between the parties, a copy of which is attached to the Plan as ***Exhibit 1*** and fully incorporated into the Plan.  Payments to Wells Fargo shall be made "outside" the Debtors' bankruptcy plan, and not considered part of their Plan approved by the court.  Wells Fargo shall retain its lien securing the claim, until the remaining amount due under the loan agreement (as modified by this Plan) is paid, at which time the lien shall be released.

<u>CLASS 2</u>:      This class consists of a secured claim by Wells Fargo Home Mortgage in the approximate amount of $102,000.00.  This claim is secured by a second-position lien on the Debtors' residence.  The Debtors participated in payment forebearance allowed by Wells Fargo as a result of the COVID-19 virus.  The treatment of this Class 1 Claim of Wells Fargo will be pursuant that Claim Stipulation between the parties, a copy of which is attached to the Plan as ***Exhibit 1*** and fully incorporated into the Plan.  Payments to Wells Fargo shall be made "outside" the Debtors' bankruptcy plan, and not considered part of their Plan approved by the court.  Wells Fargo shall retain its lien securing the claim, until the remaining amount due under the loan agreement (as modified by this Plan) is paid, at which time the lien shall be released.

<u>CLASS 3</u>:      This class consists of a secured claim by Wells Fargo Auto Finance in the approximate amount of $5,300.00.  This claim is secured by a first-position lien on the Debtor's 2005 Mercedes.  The Debtors have continued payments on this claim after the initial bankruptcy petition was filed, and this claim has been fully paid through regular payments.  The Debtors do not propose any further payments to this class and expect Wells Fargo to shortly release the lien on the vehicle.

Unless outlined differently above, payments to the above Classes will begin on the Distribution Date.  All of these creditors hold claims secured by the collateral identified.  Unless stated otherwise above or ordered by the Court, each creditor shall retain its lien on its collateral until such time as its allowed, secured claim is paid in full.  Once a secured claim is paid in full, that creditor will have no further claim against the Debtors, and it shall take all steps necessary to release any and all liens it may have.

<u>CLASS 4</u>:      This class consists of a previously-secured claim by United Bridge Capital in the approximate amount of $2,221,000.00.  This claim was secured by a first-position lien on

FIFTH AMENDED DISCLOSURE STATEMENT – Page 12

real property located at 29 Lake Creek.  The real property was owned by Inphi Partners, LLC, a

company owned by the Debtors.  The Debtors' direct liability on this loan was via a personal

guaranty, which is unsecured as to the Debtors.  Inphi Partners, LLC, previously marketed and

sold the real property securing this claim.  The sale of the property fully paid this claim, thus

releasing both Inphi Partners, LLC, and the Debtors from any further liability.  The Debtors do not

propose any further payment to this class.

CLASS 5:      This class consists of a secured claim by Eta Compute, Inc., in the

approximate amount of $1,800,000.00.  This claim was secured by a second-position lien on real

property located at 29 Lake Creek.  The real property was owned by Inphi Partners, LLC, a

company owned by the Debtors.  The Debtors' direct liability on this loan is unsecured.  Inphi

Partners' liability on this claim was secured by the lien on the property.   Inphi Partners, LLC,

previously marketed and sold the real property securing this claim.  The sale of the property paid

$1,300,000.00 to Eta Compute, Inc., on this claim.  Additionally, pursuant to a court-approved

compromise, the Debtors previously transferred ownership of all shares in Eta Compute, Inc.

(estimated to be valued at $500,000.00) to Eta Compute, Inc.  These two transfers ($500,000.00 in

stock value and $1,300,000.00 from the sale of the real property) fully paid this claim, thus

releasing both Inphi Partners, LLC, and the Debtors from any further liability.  The Debtors do not

propose any further payment to this class.

CLASS 6:              After payment of any administrative priority expenses approved by

the Court, see above, Debtors will pay the Idaho State Tax Commission and Internal Revenue

Service for any allowed pre-petition taxes, if any, in full from funds in the Debtor-in-possession

accounts, pursuant to 11 U.S.C. §1129(a)(9)(C).  In the event the Debtors do not have sufficient

funds in the Debtor-in-Possession accounts on the Distribution Date to pay these claims in full, the

Debtors shall make regular monthly payments to these creditors (starting on the Distribution Date) in the amount of $4,750.00 per month for as many months necessary until this claim is paid in full. In the event this claim is not paid in full on the Distribution Date, it shall accrue interest at the rate of 5% per annum, and shall be paid within sixty (60) months of the Petition Date. The Idaho State Tax Commission and Internal Revenue Service have filed amended proofs of claim indicating that the Debtors do not owe any tax liability for the 2018 tax year. At this point, the Debtors do not anticipate any payments to this Class.

CLASS 7:    This class consists of the presently-unsecured claim of Banatao Living Trust. Banatao was originally a creditor with a security interest in the 29 Lake Creek property that was sold by Inphi Partners. The United States Marshall currently holds the proceeds from that sale, in the amount of approximately $191,000.00. All rights of the Debtors to recover those proceeds held by the United States Marshall shall be assigned to Banatao Living Trust, and the Debtors will assist Banatao in recovering those proceeds from the United States Marshall. Other than this potential recovery of $191,000.00, the Debtors do not propose any further payment to Banatao Living Trust. Through negotiation with the Debtors, Banatao Living Trust has agreed to this Plan treatment.

CLASS 8:    This class consists of unsecured claims of general unsecured creditors (excluding Banatao Living Trust). Debtors will make payments, pro rata, to holders of general unsecured claims. The funds for payments to this class shall be from two sources. First, the Debtors will liquidate certain personal property and use the proceeds to pay this class. Second, the Debtors will make payments to this class from regular monthly income of the Debtors. These monthly-income payments will be $4,750 per month if Mr. Semones remains un-incarcerated and otherwise able to work. In the event Mr. Semones is incarcerated, these payments will be $500.00

FIFTH AMENDED DISCLOSURE STATEMENT – Page 14

per month while he is incarcerated and will increase to $4,750.00 three (3) months after Mr. Semones' release.   (In the event Mr. Semones is incarcerated, the Debtors will provide notice to the Court, creditors in this class, and other interested parties.)  The Debtors anticipate that, upon the final payments under this Plan, the holders of general unsecured claims will receive 100% of their allowed claims.  To the extent the Debtors are unable to fully pay any allowed priority tax claims immediately after confirmation, the payment to general unsecured claims will be delayed. (The Debtors do not anticipate any unpaid allowed priority tax claims.  Nevertheless, in the event such claims exist on the Effective Date of the Plan, the Debtors will provide notice to creditors in this class with the Debtors' best estimate of when monthly payments will begin.)  In the event claims in this class are not paid in full on the Distribution Date, they shall accrue interest at either (a) a negotiated rate between the Debtor and creditor, or (b) 3% per annum, whichever is lower. A chart showing creditors in this class, and estimated repayment time periods, is attached hereto as *Exhibit F*.

The Debtors currently hold minimal funds in a DIP account, based on the forebearance of their home loans by Wells Fargo.  (Payments were made from business accounts just to keep the Debtors monthly bill requirements caught up.)  Upon confirmation, the Debtors will begin making monthly payments of $4,750.00 pro rata to unsecured creditors (including all creditors in Class 8 – subject to the terms of Class 8 distributions in the event there are priority claims that need to be paid first).  Upon confirmation, the Debtors will (in the order listed and until all unsecured creditors are paid in full): (a) liquidate their Porsche, Hummer, and Harley vehicles and pay the net proceeds to the remaining unsecured creditors (this sale shall be completed within ninety (90) days of the Effective date, with payment made to creditors within thirty (30) days of the sale); and (b) begin and continue monthly payments until all remaining unsecured creditors are paid in full.

FIFTH AMENDED DISCLOSURE STATEMENT – Page 15

Except as allowed by court order, Debtors will begin making payments to these creditors on or around the Distribution Date, which is defined in the Plan to mean the tenth (10th) day after the date upon which the Confirmation Order becomes final and non-appealable.  The Confirmation Order becomes final and non-appealable fourteen days after the Confirmation Order is entered.

If any party appeals from the order confirming the plan, the Debtors will make plan payments pursuant to the Plan pending appeal.

To the extent that Debtors are unable to fully pay an allowed administrative expense immediately upon confirmation, those allowed administrative expense claims will be paid $1000.00 per month until paid, with the administrative expense holder(s) sharing pro rata in that monthly payment.

**V.**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

Debtors shall implement their Plan by using their income generated from all sources, through distribution of the funds currently held in the DIP accounts, and through liquidation and sale of personal property assets held by the Debtors, as outlined above.

**VI.**

**LIQUIDATION ANALYSIS AND FINANCIAL INFORMATION**

Debtors' liquidation analysis is attached as ***Exhibit D***.  Debtors' 12-month projections (shown on Exhibit C attached) show their expected income and living expenses for the future.

**VII.**

**DISCHARGE OF DEBTOR**

Upon completion of the Plan, Debtors will be discharged of all claims and liabilities arising prior to the filing of the petition for relief pursuant to 11 U.S.C. § 1141(d)(5).  Debtors may

FIFTH AMENDED DISCLOSURE STATEMENT – Page 16

also seek a discharge before completion of the Plan, under certain circumstances, and only after notice to all interested parties and after a hearing. At this time, the Debtors do not anticipate seeking a discharge before completion of all Plan payments.

## VIII.

### MISCELLANEOUS PROVISIONS

#### A.    Risk Factors

The initial primary risk of the proposed Plan is that Mr. Semones' income terminates as a result of incarceration. The Debtors income is largely based on two sources: Mrs. Desko's income from her architectural business, which she owns and runs, and Mr. Semones' income from financial consulting, which he also owns and runs. Mrs. Desko's income has been consistent for the past few years and Mr. Semones income was consistent prior to this arrest. The Debtors anticipate their income from the businesses will continue to be stable provided Mr. Semones remains un-incarcerated. Even if Mr. Semones is incarcerated, the Debtors believe the term of that incarceration will likely be less than the term of the plan such that he can continue contributing income to the plan after he is released. Other than Mr. Semones' incarceration risk, the Debtors believe the risk to the creditors of the proposed Plan is minimal.

#### B.    Executory Contracts and Unexpired Leases

The Plan lists all executory contracts and unexpired leases that the Debtors will assume under the Plan. Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any. The Plan also lists how the Debtors will cure and compensate the other party to such contract or lease for any such defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not listed in the Plan except for leases in which the Debtors are the lessor will be rejected under the Plan.  Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**The Plan proposes a Deadline for Filing a Proof of Claim Based on a Claim Arising from the Rejection of a Lease or Contract to be the later of thirty (30) days after the Distribution Date or thirty (30) days after entry of the final order allowing the rejection of such contract or lease**.  Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

C.    Tax Consequences of Plan

*Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.*

The following are the anticipated tax consequences of the Plan:

(1) Tax consequences to the Debtors of the Plan: None are anticipated.

(2) General tax consequences on creditors of any discharge: None are anticipated.  Any debt payments will be treated as repayment of debt by the recipient.  The creditor should consult with its own advisor concerning "write-offs" or tax deductibility of discharged indebtedness, and the proper accounting therefor.

### D.    Confirmation Requirements and Procedures

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code.  These include the requirements that:  the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible.  These requirements are <u>not</u> the only requirements listed in § 1129, and they are not the only requirements for confirmation.

### E.    Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.  A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

### 1.    *What Is an Allowed Claim or an Allowed Equity Interest?*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan.  Generally, a claim or equity interest is allowed if either (1) the Debtors have scheduled the claim on the Debtors' schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest.  When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or

allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

*The deadline for filing a proof of claim in this case was May 23, 2019 for non-governmental units, and July 23, 2019, for governmental units.*

    2.       *What Is an Impaired Claim or Impaired Equity Interest?*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is *impaired* under the Plan.  As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

    3.    *Who is **Not** Entitled to Vote*

The holders of the following five types of claims and equity interests are *not* entitled to vote:

- holders of claims and equity interests that have been disallowed by an order of the Court;

- holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.

- holders of claims or equity interests in unimpaired classes;

- holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code;

- holders of claims or equity interests in classes that do not receive or retain any value under the Plan; and

- administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the***
***Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

4.      *Who Can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

**F.      Votes Necessary to Confirm the Plan**

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes that voted have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

1.      *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

2.      *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan.  The Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the

requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

*You should consult your own attorney if a "cramdown" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.*

### G.    Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a Chapter 7 liquidation.  The values in a liquidation analysis are Debtors', or their counsel's, best estimates assuming liquidation of Debtors' assets.  The liquidation analysis uses the Fair Market Value of the property to the best of Debtors' knowledge as the owner of the property or (in the case of real estate) uses the FMV as calculated by a competent real estate professional.  It is Debtors', and Debtor's counsel's, opinion that the "as is" value would be significantly less if it were to be sold by a Chapter 7 trustee.  Secured creditors will assert and retrieve their collateral as soon as possible in the event of a liquidation thus reducing the value of Debtors' assets even more.

THE DEBTORS ESTIMATE A TWENTY-FIVE PERCENT (25%) DISCOUNT FOR LIQUIDATION OF PERSONAL PROPERTY, WHICH INCLUDES AN APPROXIMATE TWELVE PERCENT (12%) TRANSACTION COST (AUCTION FEES) FOR SELLING PERSONAL PROPERTY.  THE DEBTORS ESTIMATE AN 8% TRANSACTION COST FOR LIQUIDATING REAL PROPERTY.

Notwithstanding acceptance of the Plan by creditors, in order to confirm the Plan the Court must independently determine that the Plan is in the best interests of all classes of creditors and

stockholders.  The "best interest" test requires that the Court find that the Plan provides to each member of each impaired class of claims and interest a recovery that has a present value of at least equal to the present value of a distribution which each such person would receive from Debtors if Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code instead of being liquidated under Chapter 11 of the Bankruptcy Code.

To calculate what members of each impaired class of unsecured claims or interest would receive if Debtors' assets were liquidated, the Court must first determine the dollar amount that would be generated from the disposition or liquidation of the assets of Debtors in excess of the amount necessary to pay allowed secured claims, plus the cash held by Debtors.  The proceeds of this liquidation will then be reduced by the costs of the liquidation.  Such liquidation would likely take place in a Chapter 7 proceeding and such a proceeding would likely include the fees of a trustee as well as those of counsel and other professionals that might be retained by such trustee, selling expenses (including costs of advertising and auctioneer's fees or brokerage commissions), unpaid expenses incurred by Debtors during their proceedings under Chapter 11, and claims arising by rejection by the trustee of obligations incurred by Debtors during the pendency of the Chapter 11 case.

The liquidation costs and resulting funds available to unsecured creditors are valued by categories most reflective of the nature of the assets, its time or regulatory sensitivity to sale and the costs of liquidating the asset.  The "liquidating cost" is based upon consultation with individuals, including Debtors, who are knowledgeable in the real estate market.

Debtors' Liquidation Analysis is set forth in ***Exhibit D*** attached hereto.  As shown on the liquidation analysis, the Debtors project that funds would be available for unsecured creditors in a hypothetical Chapter 7 Liquidation.  Because the Debtors propose to pay allowed claims more

through the plan than they would receive in a hypothetical Chapter 7 liquidation, the Chapter 11

Plan will provide much more payment to unsecured creditors than a Chapter 7 liquidation.

DEBTORS FIRMLY BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF

EACH CLASS OF CREDITORS AND THAT THE CREDITORS WILL RECEIVE A LARGER

DISTRIBUTION UNDER THIS LIQUIDATION PLAN THAN THEY WOULD IF DEBTORS'

ESTATE WERE LIQUIDATED IN A CHAPTER 7 CASE.

**H.    Feasibility**

The Court must find that confirmation of the Plan is not likely to be followed by the further

liquidation, or the need for further financial reorganization, of Debtors or any successor to Debtors,

unless such liquidation or reorganization is proposed in the Plan.

1.    *Ability to Initially Fund Plan*

Based on the current cash on hand the Debtors believe they will have sufficient cash on

hand on or shortly after the Effective Date of the Plan to pay all the claims and expenses that are

entitled to be paid on that date, or that those claims and expenses can be paid quickly thereafter.

2.    *Ability to Make Future Plan Payments and Operate Without Further*
       *Reorganization*

The Debtors must also show that it will have enough cash over the life of the Plan to make

the required Plan payments.  The Plan provides for the orderly liquidation of certain personal

property and recovery of funds from the U.S. Marshal.  The Debtors believe there is an existing

market for the property and that it will be able to liquidate those assets without significant

difficulty.  Further, the Debtors assert that their income is projected to remain the same and

otherwise fund the Plan.  However, in the event Tim Semones is incarcerated, the Plan payments

will decrease during the term of that incarceration.

*You Should Consult with Your Accountant or Other Financial Advisor If You Have Any Questions Pertaining to These Projections.*

## V.    EFFECT OF CONFIRMATION OF PLAN

### A.    Vesting of Property of the Estate.

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date, all property in the Estate, all Causes of Action, and any property acquired by Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances, except as provided for in the Plan. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. In the event of a later conversion to Chapter 7, the property shall re-vest with the Chapter 7 bankruptcy estate, subject to any exemption claims or other applicable provision of the Bankruptcy Code.

The "Absolute Priority Rule" contained in section 1129 of the Bankruptcy Code states that for unsecured classes that have not accepted the plan, (a) the plan must provide that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (b) no holders of junior claims retain anything of value from the plan. *See 11 U.S.C. §§ 1129(b)(1) & 1129(b)(2)(B).* Here, the Debtors either propose full payment (with interest) to unsecured creditors (class 8), or anticipate consent to the Plan. Accordingly, the Debtors believe they meet all requirements of the Absolute Priority Rule. Further discussion of this issue will be done in connection with the Debtors' Pre-Confirmation report after ballots from classes are solicited and returned.

**B.      Modification of Plan**

The Debtors may modify the Plan at any time before confirmation of the Plan.  However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Debtors may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**C.      Default under the Plan.**

In the event the Debtors default under the terms of the Plan, the secured creditors may exercise state law remedies to collect their collateral and there may not be any funds available to the unsecured creditors.  Default under the plan includes failure to make monthly payments as required, failure to provide required reports, and failure to liquidate the personal property.  If a default under the terms of the confirmed Plan occurs, creditors may petition the court to enforce the plan, to dismiss the case without entry of a discharge, or to convert the case to Chapter 7.  In the event of any default under the terms of the confirmed Plan, secured, priority and unsecured creditors may have other rights in addition to recovery of their collateral and/or dismissal or conversion of the case, and should consult their own legal counsel regarding those rights.

/

/

/

/

/

FIFTH AMENDED DISCLOSURE STATEMENT – Page 26

/

/

## G.    Final Decree

Once the Plan has been confirmed, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtors may file a motion with the Court to obtain a final decree to close the case.  Alternatively, the Court may enter such a final decree on its own motion.


DATED: December 15, 2020.


_____/s/__Timothy Semones_____
Timothy Semones


_____/s/__Susan Desko_____
Susan Desko




_____/s/_Matt Christensen_____
Matthew T. Christensen, attorney for the Debtors

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of December, 2020, I filed the foregoing FIFTH AMENDED DISCLOSURE STATEMENT electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Lesley Bohleber | ecfidb@aldridgepite.com |
| Craig W. Christensen | cwc@racinelaw.com |
| Matthew T. Christensen | mtc@angstman.com |
| Scott D. Goldsmith | goldsmith.scott@dorsey.com |
| Robert Glenn Harris | rob@bindermalter.com |
| Amber K. Kauffman | amber.kauffman@tax.idaho.gov |
| J. Michael Keyes | keyes.mike@dorsey.com |
| Peter J. Kuhn | peter.j.kuhn@usdoj.gov |
| Edward B. Magarian | magarian.edward@dorsey.com |
| Jed W. Manwaring | jmanwaring@evanskeane.com |
| Chad R. Moody | chad@angstman.com |
| David W. Newman | ustp.region18.bs.ecf@usdoj.gov |
| US Trustee | ustp.region18.bs.ecf@usdoj.gov |
| Steven T. Waterman | waterman.steven@dorsey.com |

Any others as listed on the Court's ECF Notice.

I FURTHER CERTIFY that on the 15th day of December, 2020, I served a copy of the FIFTH AMENDED DISCLOSURE STATEMENT on all parties listed on the attached mailing matrix, via US Mail, postage prepaid.

/s/ Matt Christensen
Matthew T. Christensen

# EXHIBIT A

Matthew T. Christensen, ISB: 7213
Chad R. Moody, ISB: 9946
ANGSTMAN JOHNSON
199 N. Capitol Blvd, Ste 200
Boise, ID 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@angstman.com
　　　chad@angstman.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re: | Case No. 19-40057-JMM |
| TIMOTHY D. SEMONES and SUSAN C. DESKO, | Chapter 11 |
| Debtors. | |

**FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

The Debtors, Timothy D. Semones ("Semones") and Susan C. Desko ("Desko"), and hereby submit their Fourth Amended Plan of Reorganization (the "Plan" or "Plan of Reorganization").

**ARTICLE l - DEFINITIONS**

1.1 <u>Definitions.</u> The capitalized terms used herein shall have the respective meanings as set forth below.

　　　(a) "Allowed" Claim shall mean claim as allowed pursuant to 11 U.S.C. §502.

　　　(b) "Bankruptcy Court" shall mean the United States Bankruptcy Court.

　　　(c) "Debtors" shall mean the Debtors-in-possession, as identified in the caption.

　　　(d) "Claim(s)" shall mean claim, as defined in 11 U.S.C. § 101(5).

(e) "Confirmation" shall mean approval of the Plan by order of the Bankruptcy Court pursuant to 11 U.S.C. §§ 1128 and 1129.

(f) "Distribution Date" shall mean the tenth (10th) day after the date upon which the Confirmation Order becomes final and non-appealable. The Confirmation Order becomes final and non-appealable fourteen (14) days after the Confirmation Order is entered, if no appeal is filed, and after the conclusion of any appeal, if any party does appeal the entry of the Confirmation Order.

(g) "Effective Date" shall mean the date upon which the court enters its Confirmation Order.

## ARTICLE 2 - CLASSIFICATION OF CLAIMS

2.1    The Debtors' Plan of Reorganization provides for administrative expenses and establishes classes for claims. Those classes are:

1. Secured Claim of Wells Fargo Bank (secured by first-position lien on real property located at 105 Madison Ave)
2. Secured Claim of Wells Fargo Bank (secured by second-position lien on real property located at 105 Madison Ave)
3. Secured Claim of Wells Fargo Auto Finance (secured by first-position lien on 2005 Mercedes)
4. Secured Claim of United Bridge Capital (unsecured as to Debtors, but secured by first-position lien on real property located at 29 Lake Creek)
5. Secured Claim of Eta Compute, Inc. (unsecured as to Debtors, but secured by second-position lien on real property located at 29 Lake Creek)
6. Claims for Priority Taxes
7. Claim of Banatao Living Trust
8. General Unsecured Claims

## ARTICLE 3 - UNIMPAIRED AND IMPAIRED CLASSES OF CLAIMS

3.1    Unimpaired Classes.  Class 3 – the secured claim of Wells Fargo Auto Finance.

3.2    Impaired Classes.  All remaining classes are impaired under this Plan.

## ARTICLE 4 - ADMINISTRATIVE EXPENSES

Each holder of an allowed administrative expense shall receive the fully allowed amount of such claim in cash at confirmation or as otherwise agreed. The Bankruptcy Court will review and allow, in an amount it believes appropriate, any application for approval of compensation for professionals, including attorneys, accountants, real estate appraisers or other professionals. The cost of those professional services is unknown at this time. The amount of compensation approved by the bankruptcy court for those professional services shall be paid as an administrative priority claim.

Until compensation for a professional is approved, Debtors are prohibited from making any payment from funds of the estate on those fees. Debtors shall submit an application for approval of compensation at an appropriate time, and shall give notice to all interested parties of any application for compensation.

To the extent that the Debtors have fees and costs due to more than one professional, each professional shall have equal priority with other professionals. These fees and costs shall be paid in full before any payment is due or is made to any other unsecured claim. *See 11 U.S.C. §1129(a)(9).*

To the extent Debtors do not have funds on hand or in bank accounts from which to pay professional fees and costs approved by the Court and not paid from a retainer, Debtors will pay the professional fees and costs from funds otherwise to be used to pay holders of unsecured claims until paid in full. These funds may come from the funds that would otherwise be used to pay priority tax claims and general unsecured claims. To the extent that Debtors do pay an allowed

administrative expense, the payment to priority tax claims or unsecured creditors not paid previous to that date may be delayed.

As of the date of filing of this Plan, Debtors have an attorney whose employment was approved, Angstman Johnson.  That firm currently holds some funds in a client trust account to be applied towards any awards of compensation for those attorneys.  No other professionals have been employed in this case.

Pursuant to 28 U.S.C. § 1930(a)(6), the Debtors are obligated to pay quarterly fees to the United States Trustee during the pendency of the chapter 11 case until a plan is confirmed.  The United States Trustee's quarterly fees are an administrative expense, and any unpaid allowed US Trustee fees shall be paid on the Effective Date of the plan by virtue of 11 U.S.C. § 1129(a)(12). The Debtors shall pay, when due, all quarterly fees incurred from the date of confirmation until the case is closed by the Court, converted or dismissed, whichever occurs first.  The Debtors currently dispute certain United States Trustee's fees assessed by the U.S. Trustee.  The disputed fees will be paid once allowed by the Court.

### ARTICLE 5 - PROVISIONS FOR TREATMENT OF CLASSES OF CLAIMS

The Debtors propose to treat the classes as follows:

A.  <u>CLASS 1:</u>    This class consists of a secured claim by Wells Fargo Home Mortgage in the approximate petition-date amount of $459,400.00.  This claim is secured by a first-position lien on the Debtors' residence.  The Debtors participated in payment forebearance allowed by Wells Fargo as a result of the COVID-19 virus.  The treatment of this Class 1 Claim of Wells Fargo will be pursuant that Claim Stipulation between the parties, a copy of which attached hereto as ***Exhibit 1*** and fully incorporated

herein by this reference.  Payments to Wells Fargo shall be made "outside" the Debtors' bankruptcy plan, and not considered part of their Plan approved by the court.  Wells Fargo shall retain its lien securing the claim, until the remaining amount due under the loan agreement (as modified by this Plan) is paid, at which time the lien shall be released.

B. <u>CLASS 2:</u>       This class consists of a secured claim by Wells Fargo Home Mortgage in the approximate petition-date amount of $102,000.00.   This claim is secured by a second-position lien on the Debtors' residence.  The Debtors participated in payment forebearance allowed by Wells Fargo as a result of the COVID-19 virus. The treatment of this Class 1 Claim of Wells Fargo will be pursuant that Claim Stipulation between the parties, a copy of which attached hereto as ***Exhibit 1*** and fully incorporated herein by this reference.  Payments to Wells Fargo shall be made "outside" the Debtors' bankruptcy plan, and not considered part of their Plan approved by the court.  Wells Fargo shall retain its lien securing the claim, until the remaining amount due under the loan agreement (as modified by this Plan) is paid, at which time the lien shall be released.

C. <u>CLASS 3:</u>       This class consists of a secured claim by Wells Fargo Auto Finance in the approximate amount of $5,300.00.  This claim is secured by a first-position lien on the Debtor's 2005 Mercedes.  The Debtors have continued payments on this claim after the initial bankruptcy petition was filed, and this claim has been fully paid through regular payments.  The Debtors do not propose any further payments to this class, and expect Wells Fargo to shortly release the lien on the vehicle.

Unless outlined differently above, payments to the above Classes will begin on the Distribution Date. All of these creditors hold claims secured by the collateral identified. Unless stated otherwise above or ordered by the Court, each creditor shall retain its lien on its collateral until such time as its allowed, secured claim is paid in full. Once a secured claim is paid in full, that creditor will have no further claim against the Debtors, and it shall take all steps necessary to release any and all liens it may have.

D. <u>CLASS 4:</u>    This class consists of a previously-secured claim by United Bridge Capital in the approximate amount of $2,221,000.00. This claim was secured by a first-position lien on real property located at 29 Lake Creek. The real property was owned by Inphi Partners, LLC, a company owned by the Debtors. The Debtors' direct liability on this loan is via a personal guaranty, which is unsecured as to the Debtors. Inphi Partners, LLC, previously marketed and sold the real property securing this claim. The sale of the property fully paid the debt to United Bridge Capital, thus releasing both Inphi Partners, LLC, and the Debtors from any further liability. The Debtors do not propose any payment to this class.

E. <u>CLASS 5:</u>    This class consists of a secured claim by Eta Compute, Inc., in the approximate amount of $1,800,000.00. This claim was secured by a second-position lien on real property located at 29 Lake Creek. The real property was owned by Inphi Partners, LLC, a company owned by the Debtors. The Debtors' direct liability on this loan is unsecured. Inphi Partners, LLC, previously marketed and sold the real property securing this claim. The sale of the property and transfer of Eta Compute stock fully paid the debt to Eta Compute, Inc., on this claim. Pursuant to a court-approved compromise, the Debtors previously transferred ownership of all shares in

Eta Compute, Inc. to Eta Compute, Inc.  These two payments (stock and payment by Inphi Partners) fully paid this claim, thus releasing both Inphi Partners, LLC, and the Debtors from any further liability.  The Debtors do not propose any further payment to this class.

F.  CLASS 6:                After payment of any administrative priority expenses approved by the Court, see above, Debtors will pay the Idaho State Tax Commission and Internal Revenue Service for any allowed pre-petition taxes, in full from funds in the Debtor-in-possession accounts, pursuant to 11 U.S.C. §1129(a)(9)(C).  However, in the event the Debtors do not have sufficient funds in the Debtor-in-Possession accounts on the Distribution Date to pay these claims in full, the Debtors shall make regular monthly payments to these creditors (starting on the Distribution Date) in the amount of $4,750.00 per month for as many months necessary until this claim is paid in full.  In the event this claim is not paid in full on the Distribution Date, it shall accrue interest at the rate of 5% per annum, and shall be paid within sixty (60) months of the Petition Date.

G.  CLASS 7:      This class consists of the presently-unsecured claim of Banatao Living Trust.  Banatao was originally a creditor with a security interest in the 29 Lake Creek property that was sold by Inphi Partners.  The United States Marshall currently holds the proceeds from that sale, in the amount of approximately $191,000.00.  All rights of the Debtors to recover those proceeds held by the United States Marshall shall be assigned to Banatao Living Trust, and the Debtors will assist Banatao in recovering those proceeds from the United States Marshall.  Other than this

FOURTH AMENDED CHAPTER 11 PLAN – PAGE 7
Matter: 13099-001

potential recovery of $191,000.00, the Debtors do not propose any further payment to Banatao Living Trust.  Banatao Living Trust has agreed to this Plan treatment.

H.  CLASS 8:    This class consists of unsecured claims of general unsecured creditors (excluding Banatao Living Trust).  Debtors will make payments, pro rata, to holders of general unsecured claims.  The funds for payments to this class shall be from two sources.  First, the Debtors will liquidate certain personal property and use the proceeds to pay this class.  Second, the Debtors will make payments to this class from regular monthly income of the Debtors.  These monthly-income payments will be $4,750 per month if Mr. Semones remains not incarcerated and otherwise able to work. In the event Mr. Semones is incarcerated, these payments will be $500.00 per month while he is incarcerated and will increase to $4,750.00 three (3) months after Mr. Semones' release  The Debtors anticipate that, upon the final payments under this Plan, the holders of general unsecured claims in this class will receive 100% of their allowed claims.  To the extent the Debtors are unable to fully pay any allowed priority tax claims immediately after confirmation, the payment to general unsecured claims will be delayed.  (At this point, the Debtors do not anticipated any unpaid priority tax claims. Nevertheless, if such claims exist on the Effective Date, notice will be provided to creditors in this class, along with the Debtors' estimate of when monthly plan payments will begin.)    Claims in this class shall accrue interest at either (a) a negotiated rate between the Debtor and creditor, or (b) 3% per annum, whichever is lower, beginning on the Effective Date of the Plan.

The Debtors currently hold minimal funds in DIP accounts.  Upon confirmation, the Debtors will begin making monthly payments pro rata to unsecured creditors (including all

creditors in Class 7) beginning on the Effective Date.  Upon confirmation, the Debtors will (in the order listed and until all unsecured creditors are paid in full): (a) liquidate their Porsche, Hummer, and Harley vehicles and pay the net proceeds to the remaining unsecured creditors; and (b) continue monthly payments until all remaining unsecured creditors are paid in full.

## ARTICLE 6 - SECURITIES TO BE ISSUED PURSUANT TO THIS PLAN

6.1  No securities will be issued pursuant to this Plan.

## ARTICLE 7 - ACCEPTANCE OR REJECTION OF PLAN

7.1  <u>Classes Entitled to Vote.</u>  All holders of Allowed Claims shall be entitled to vote individually by class to accept or reject this Plan.

7.2  <u>Requirements for Acceptance of Plan  by Classes.</u>  A class of claims shall have accepted this Plan if it is accepted by the holders of Allowed Claims of at least two-thirds (2/3) of the total amount of the Allowed Claims held by those in the class who voted and more than one-half (1/2) in number of the total number of those in the class who voted.

7.3  <u>Cram Down.</u>  In the event that any impaired Class fails to accept this Plan in accordance with Section 7.2, above, the Debtors reserve the right to request the Bankruptcy Court to confirm this Plan pursuant to 11 U.S.C. §1129(b).

## ARTICLE 8 - MEANS FOR IMPLEMENTING THE PLAN

8.1 <u>Source of Payments.</u>  The Debtors will make chapter 11 plan payments by using their income generated from all sources and through liquidation and sale of the other assets held by the Debtors, as outlined above.  Additionally, the Debtors will cooperate with Banatao in its efforts to

release the funds held by the US Marshal.  The Debtors will liquidate the vehicles described above

(Porsche, Hummer and Harley vehicles) within ninety (90) days of the Effective Date of the Plan,

and will pay the net proceeds to Class 8 within thirty (30) days of the liquidation of the vehicles.


## ARTICLE 9 - PROVISIONS GOVERNING DISTRIBUTIONS

9.1  <u>Date of Distributions.</u>  Under this Plan, distributions of cash shall be made as provided

for herein, or as otherwise may be ordered in writing by the Bankruptcy Court.

9.2  <u>Cash Payments.</u>  Cash payments required by this Plan may be made by check drawn

on a domestic bank.

9.3  <u>Time Bar to Payments by Check.</u>  Checks issued by the Debtors in payment of Allowed

Claims shall become null and void if not presented for final payment within ninety (90) days of

the date of issuance thereof.  After such date, any Claim on account of which such an instrument

was issued shall be discharged and forever barred.


## ARTICLE 10 - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.1  <u>Assumed If Not Rejected.</u>  The following contracts and leases subject to the

provisions of 11 U.S.C. §365 hereby are specifically assumed:  **NONE.**

10.2  <u>Bar to Rejection Damages.</u>  If the Debtors' rejection of any executory contract or

unexpired lease produces an Allowed Claim for damages, such Claim, if not theretofore evidenced

by a filed proof of claim, shall forever be barred and unenforceable against the Debtors or their

property unless such a proof of claim is filed with the Bankruptcy Court and served upon counsel

for the Debtors by the later of thirty (30) days after the Distribution Date or thirty (30) days after entry of the final order allowing rejection of such contract or lease.

## ARTICLE 11 - PROCEDURES FOR RESOLVING CONTESTED AND CONTINGENT CLAIMS

11.1  <u>Objection Deadline.</u>  As soon as is practicable, but in no event later than six (6) months after the Distribution Date, all objections to Claims shall be filed with the Bankruptcy Court and served upon the holder of each objected-to Claim.

11.2  <u>Prosecution of Objections.</u>  The Debtors shall litigate to judgment, settle or withdraw any objection made to contested Claims.

11.3  <u>No Distribution Pending Allowance.</u>  Notwithstanding any other provision of the Plan, no payment or distribution shall be made with respect to all or any portion of a contested Claim unless and until any objection to such contested Claim shall have been determined by final order of the Bankruptcy Court.

11.4  <u>Treatment of Contingent Claims.</u>  Except as otherwise stated herein, until such time as a contingent Claim becomes fixed and absolute, such Claim shall be treated as a contested Claim for purposes of estimation, allocation and distribution.

## ARTICLE 12 - MISCELLANEOUS PROVISIONS

12.1  <u>Prepayment.</u> The Debtors shall have the right at any time to prepay, without penalty, all or any portion of an Allowed Claim.

12.2  <u>Compliance With Tax Requirements.</u>  The Debtors shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities to the extent that any payment or distribution under this Plan shall be subject to any such requirement.

12.3  <u>Compliance With All Applicable Laws.</u>  In the implementation of the provisions of this Plan, the Debtors shall comply with every applicable law, rule, regulation or order; provided that nothing contained herein shall require such compliance where the legality or applicability of any such law, rule, regulation or order is being contested by the Debtors in appropriate proceedings in good faith and, if required, for which an adequate reserve has been set aside.

12.4  <u>Set-offs.</u>  The Debtors may, but shall not be required to, set off against any Claim and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever the Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim that the Debtors may have against such holder.

12.5  <u>Discharge of the Debtors.</u>  All payments and distributions made by the Debtors under this Plan shall be in exchange for and in complete satisfaction, discharge, release and cancellation of, all Claims of any nature whatsoever concerning the Debtors or any of their assets or properties. Except as otherwise provided herein, upon the entry of an Order of Discharge at completion of the Plan or otherwise, the Debtors shall be deemed discharged and released from all claims pursuant to 11 U.S.C. §1141(d)(5)(A), including but not limited to demands and liabilities that arose before the filing of the Petition and all debts of the kind specified in 11 U.S.C. §§502(g), 502(h) and 502(i), whether or not (I) a proof of claim based upon such debt is filed or deemed filed under 11 U.S.C. §501; (ii) a Claim based upon such debt is Allowed; or (iii) the holder of a Claim based upon such debt has accepted this Plan.  Debtors may seek, but do not anticipate seeking, a discharge before completion of the plan, after notice to all interested parties and after a hearing.

12.6.  <u>Appointment of Disbursing Agent.</u>  The Debtors shall be the disbursing agents for the estate.

12.7.  <u>Sale of Property</u>.  At any time during the term of this Plan, the Debtors may sell property when the Debtors deem the sale expedient.  The sale proceeds may be applied to the secured portion of the appropriate secured creditor's claim thereby reducing the amount of the payments to such creditor by the amount of the sale proceeds.

12.8.  <u>Retention of Property</u>.  The Debtors shall retain all property of the estate, except such personal property that is not needed by the Debtors for an effective reorganization.  Property that is not needed will be abandoned or sold and the proceeds applied to the appropriate secured creditor's claim, whichever is deemed appropriate by the Debtors.

12.9.  <u>Execution of the Plan</u>.  The Debtors shall adhere to the payment and distribution schedules described within this Plan.

12.10.  <u>Post-filing Indebtedness</u>.  No post-filing indebtedness, other than what has been set forth in this Plan, has been incurred by the Debtors which indebtedness is in arrears or is not current.

12.11.  <u>Adversary Proceedings</u>.  The Debtors reserve the right to begin or continue any adversary proceedings permitted under Title 11 of the United States Code.

12.12.  <u>Use of Cash Collateral and Additional Secured Debts</u>.  The Debtors may continue to use cash collateral (to the extent any creditor claims that they have an interest in any cash collateral) in their day-to-day affairs and payment of various secured debts, provided their plan payments are current.  The right to use cash collateral shall terminate if the Debtors do not make the payments stated above, and continued use shall be allowed only when the payments are brought current.  The Debtors also reserve the right to seek authorization to incur secured debts in accordance with 11 USC §364(c) and (d) of the Bankruptcy Code.

12.13. <u>Vesting of Property of the Estate</u>.    Upon confirmation, all property of the bankruptcy estate shall revest with the Reorganized Debtors and the bankruptcy estate shall cease to exist.  In the event of a later conversion to Chapter 7, the property shall re-vest with the Chapter 7 bankruptcy estate, subject to any exemption claims or other applicable provisions of the Bankruptcy Code.

## ARTICLE 13 - CONSUMMATION OF PLAN

13.1    <u>Retention of Jurisdiction</u>.  The court will retain jurisdiction under this Plan until this Plan has been fully consummated, including but not limited to the following purposes:

A.    Classification of the claim of any creditor and the re-examination of the claims which have been allowed for the purposes of voting, and the determination of such objections as may be filed to the creditors claims.  The failure by the Debtors to object or examine any claim for the purposes of voting shall not be deemed a waiver of the Debtors' right to object to allowance thereafter.

B.    Determination of all core proceedings.

C.    The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this Plan or order of confirmation as may be necessary to carry out the purposes and intent of this Plan.

D.    The modification of this Plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code.

E.    To enforce and interpret the terms and conditions of this Plan.

F.      Entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtors and to impose such limitations, restrictions, terms and conditions as this court may deem necessary.

G.      Entry of all necessary orders, judgments and decrees.

H.      Entry of an order concluding and terminating this case.

13.2    Withdrawal of Plan.  The Debtors reserve the right to revoke and withdraw this Plan prior to Confirmation.  If the Debtors revoke or withdraw this Plan, or if Confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further or other proceedings involving the Debtors.

/

/

/

/

/

/

/

/

/

/

/

/

## ARTICLE 14 – CONCLUSION

The Debtors have given every thought to the complex problems confronting them and their

changing situations, and with the assistance of their counsel have devised and formulated this Plan.

This Plan is respectfully submitted with the hope that its equity and fairness will be considered by

all parties in interest, whose consent is necessary to perfect it.  It is further hoped that all creditors

will join in an affirmative vote for the Plan in order that they, as well as the Debtors, will receive

the maximum benefits to be derived therefrom.  The Debtors have not audited the claims or other

figures; however, this Plan and the approved Disclosure Statement are as accurate as is feasible

under the circumstances.

DATED: December 15, 2020.

   /s/ Timothy Semones                        /s/ Susan Desko      

Timothy Semones, Debtor                      Susan Desko, Co-Debtor

    /s/ Matt Christensen       
Matthew T. Christensen, Attorney for the Debtors

EXHIBIT 1

1  JESSE A.P. BAKER (SBN 8411)
   **ALDRIDGE | PITE, LLP**
2  4375 Jutland Drive, Suite 200
   P.O. Box 17933
3  San Diego, CA 92177-0933
   Telephone: (858) 750-7600
4  Facsimile: (619) 590-1385

5  Attorneys for Secured Creditor:
   Wells Fargo Bank, N.A.

6

                    **UNITED STATES BANKRUPTCY COURT**
7
                    **DISTRICT OF IDAHO (TWIN FALLS)**
8

9   In re                          | Case No. 19-40057-JMM

10  TIMOTHY D. SEMONES and SUSAN C. | Chapter 11
    SEMONES,
11                                  | **CLAIM TREATMENT STIPULATION**
                Debtors and Debtors in | **UNDER CHAPTER 11 PLAN**
12              Possession.
                                    | **Class 1**
13
                                    | **Subject Property:**
14                                  | 105 Madison Avenue
                                    | Blaine County, ID 83340
15                                  | [1st DOT]
16
                                    | **Hearing**:
17                                  | Date:   December 15, 2020
                                    | Time:  1:30 p.m.
18                                  | Place:  U.S. Federal Building
                                    | Judge: Hon. Chief Joseph M. Meier
19

20

21          This Claim Treatment Stipulation ("Stipulation") is entered into by and between Secured

22  Creditor Wells Fargo Bank, N.A. ("Creditor"), and Debtors, Timothy and Susan Semones

23  ("Debtors"), by and through their respective attorneys of record.

24          The property which is the subject of this matter is commonly known as 105 Madison Avenue,

25  Blaine County, ID 83340 (hereinafter the "Subject Property").

26  **The Claim**:

27          The Loan is evidenced by a promissory note dated July 18, 2003, executed by Debtors to

28  Wells Fargo Home Mortgage, Inc. ("Lender") in the principal sum of $714,000.00 (the "Note"). The

    Note is indorsed to blank. A copy of the Note is attached to Creditor's Proof of Claim, which is

incorporated hereby by this reference. (*See, Claim No.11-1*).

The Note is secured by a 1st Deed of Trust against Subject Property  (*See, Claim No.11-1*). The Deed of Trust was duly recorded.  The Note and Deed of Trust may be referred to collectively herein as the "Loan."  On or about May 10, 2004, Lender merged with and into Wells Fargo Bank, N.A. (*Id.*)

**The Bankruptcy Case**:

On January 1, 2019, Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Idaho –Twin Falls Division and assigned Case No. 19-40057-JMM.

According to Debtors' Petition and Schedules, the Subject Property is identified as the Debtors' principal residence.  (*See*, Dkt. No.1).

Creditor filed a Proof of Claim against the Debtors' Bankruptcy Estate in the amount of $486,875.35, secured by the Subject Property, with $250.74 in pre-petition arrears. ((*See, Claim No.11-1*).

On May 21, 2020, Creditor filed a Notice of Request for Mortgage Forbearance for 90 days Due to Covid-19 with the Court ("Covid Forbearance").  (*See*, Dkt. No.121).  Per the Covid Forbearance, Debtors were provided a 90 day forbearance as to their monthly mortgage payments commencing April 1, 2020, through June 1, 2020. (*Id.*).  Though not filed with the Court, Creditor has extended the Debtors' Covid Forbearance through December 31, 2020, with payments to resume on January 1, 2021.

On November 6, 2020, Debtors filed their 4th Amended Chapter 11 Disclosure Statement ("Disclosure Statement") and 3rd Amended Plan of Reorganization Dated ("Plan").  *See, Dkt. Nos.151, and 150, respectively*.  Creditor's Claim is the Class 1 Impaired Secured Claim.  The Plan states Debtors are not in default on this loan, but took advantage of a payment deferral program offered by Creditor in light of the Covid-19 pandemic, and future payments will be paid directly to Creditor. These payments to Creditor shall be made "outside" the Debtors' bankruptcy plan, and not considered part of their Plan approved by the court. Creditor shall retain its lien securing the claim, until the remaining amount due under the loan agreement is paid, at which time the lien shall be

released. The Plan further provides that any payments deferred in 2020 shall be added to the end of the existing loan term of Creditor's loan.

On November 13, 2020, Creditor filed an Objection to Debtors' Disclosure Statement and Plan regarding the proposed treatment as it sought to improperly modify Creditor's Claim in violation of Section 1123(b)(5) and to clarify the forbearance period actually granted. (*See*, Dkt. No.156). This Stipulation is to address the issues raised in Creditor's Objection and resolve the treatment of Creditor's Claim.

**THE PARTIES STIPULATE AS FOLLOWS:**

1.      Creditor's claim (is successors and/or assigns), secured by the Subject Property shall be fully secured, paid in full and Debtors' Plan shall not alter or modify the legal, equitable, and contractual rights under the Loan ("Secured Claim"). Creditor's Secured Claim shall be impaired pursuant to 11 U.S.C. §1124 solely to the extent that Debtors shall cure the contractual/forbearance arrears as set forth herein.

2.      Contractual Payments (Includes Escrow).  Debtors shall tender regular monthly contractual payments to Creditor on the first day of each month for the Secured Claim commencing January 1, 2021 and continuing on the first day of each month thereafter until the Maturity Date under the Loan when all outstanding amounts owed on the Secured Claim, including any escrow payments and/or charges as required per the terms and provisions of this Stipulation and/or the Loan, are to be paid in full.  The amount of the contractual monthly payment of principal, interest and escrow will be $4,075.90.  The Debtors understand this payment is subject to change per the Loan and/or any escrow analysis of Creditor (and/or its servicer), including subsequent to this Stipulation.

3.      Cure of Contractual and/or Forbearance Arrears.

3.1      Debtors shall cure the total contractual and/or forbearance arrears owing on Creditor's claim through December 31, 2020 in the amount of $38,602.70 in equal monthly installments over 48 months.  Debtors shall commence the contractual/forbearance payments in the amount of $804.23, commencing on the first day of the first month following entry of the Order Confirming Debtors' Chapter 11 Plan, and continuing on the first day of each month thereafter for a period of 47 months thereafter at which time any and/all remaining

1    contractual/forbearance arrears must be paid in full. Debtors will need to send the

2    contractual/forbearance payments as a separate payment so these can be tracked. If the

3    Debtors seek to sell or refinance the Subject Property any time prior to curing the

4    contractual/forbearance arrears as set forth herein, all outstanding contractual/forbearance

5    arrears must likewise be paid in full at the time of any such sale and/or refinancing.

6        3.2    The parties agree that in the event Creditor grants Debtors any further Covid

7    Forbearance extensions subsequent to entering into this Stipulation, the parties shall

8    promptly file an Amended Claim Stipulation to reflect any changes to the new Covid

9    Forbearance period, re-commencement of the regular contractual monthly payments of

10    principal, interest and escrow, as well as the updated amount of total contractual

11    arrears/forbearance arrears that must then be cured, which Debtors will note in any Chapter

12    11 Plan per paragraph 11 below.

13        3.3.    Notwithstanding the foregoing, if Debtors miss any regular contractual payment after

14    January 1, 2021, or as required under any additional Covid 19 Forbearance period noted by

15    amendment to this Stipulation,, said missed payment shall not be subject to this paragraph 3,

16    but instead shall be considered a default under this Stipulation and subject to default

17    provisions herein, and any and all penalties, interest or other fees and charges as required

18    under the Loan.

19        5.    Except as otherwise expressly provided herein, all remaining terms of the Loan,

20    which is incorporated herein by this reference, shall govern the treatment of Creditor's Secured

21    Claim.

22        6.    <u>Pre-Confirmation Default</u>: In the event of any default on any of the provisions of this

23    Stipulation prior to confirmation of Debtors' Chapter 11 Plan, Creditor shall provide written notice,

24    via certified mail, to Debtors at the Subject Property and to Debtors' attorney of record, indicating

25    the nature of default. If Debtors fails to cure the default within the passage of thirty (30) calendar

26    days from the date said written notice is placed in the mail as reflected on the certified receipt,

27    Creditor may file and serve a declaration under penalty of perjury specifying the default, together

28    with a proposed order Terminating the Automatic Stay, which the Court may grant without further

notice or hearing, and Creditor may commence any and all action necessary to obtain complete possession of the Subject Property under the terms of the Loan and applicable state law, including but not limited to foreclosure thereof, without further notice, order, or proceeding of this Court.

7.    Post-Confirmation Default.  Upon confirmation of Debtors' Chapter 11 Plan, the Automatic Stay shall be deemed terminated as to the Debtors and estate vis-à-vis the Creditor, and Creditor shall no longer be required to comply with paragraph 6 above.  Instead, Creditor may provide Debtors notice of any default related to the Stipulation in accordance with the Loan, and applicable state law and/or proceed with its remedies under the terms of the Loan and applicable state law, including but not limited to foreclosure of the Subject Property, without further notice, order, or proceeding of this Court.

8.    Any forbearance by Creditor in exercising any right or remedy, including, without limitation, Creditor accepting payments from third persons, entities or successors in interest to Debtors, or in amounts less than the amount due, including as provided for under this Stipulation, shall not be a waiver of or preclude the Creditor's exercise of any right or remedy under the Stipulation, and/or Loan.  The acceptance by Creditor of a late or partial payment shall not act as a waiver of its right to proceed hereunder or under the Loan documents.

9.    In the event the Debtors default under this Stipulation and Creditor forwards a default letter to Debtors, Debtors shall be required to tender Creditor's reasonable attorneys' fees and costs for each default letter submitted, in addition to the default amount stated therein, in order to cure the default. Any notice of default that Creditor provides Debtors and/or Debtors' attorneys pursuant to this Stipulation shall not be construed as a communication under the Fair Debt Collection Practices Act, 15 U.S.C. §1692.

10.    The Debtors have reviewed and have no objection to Creditor's Proof of Claim.

11.    Debtors shall attach a copy of this Stipulation and Order thereon, and any amendments thereto, to any Chapter 11 Plan filed in this case as an exhibit and said Plan shall expressly incorporate the terms and provisions of this Stipulation and amendments thereto into Debtors' Chapter 11 Plan by reference (including any amended or modified Chapter 11 Plan).  In the event of a conflict between a provision of Debtors' Plan and the Stipulation as to Creditor's claim,

the Stipulation shall control.  Further, the terms and provisions of this Stipulation may not be modified, altered, or changed by any Chapter 11 Plan, including any subsequently filed amended or modified Chapter 11 Plan of Reorganization and/or confirmation order on the foregoing without the express written consent of Creditor.

12.     In the event the Debtors' case is dismissed or converted to any other chapter under Title 11 of the United States Bankruptcy Code, Creditor shall retain its lien in the full, unmodified amount due under the Loan, and Debtors' will no longer be allowed to cure the contractual arrears as set forth herein, but may seek the assistance through Creditor's Loss Mitigation program to cure and/or address any contractual/forbearance arrears.

13.     Nothing herein shall preclude or prevent Debtors from seeking, or the parties from discussing a potential loan modification with respect to the Loan, or subsequently entering into such agreement with Creditor (and/or its servicer) prior to or after the confirmation of Debtors Plan, which may supersede and/or replace the terms of this Stipulation; however, nothing in this Stipulation shall be construe to require or obligate Creditor (and/or its servicer) in any way to discuss, enter into, agree to enter into, offer or accept any such loan modification.

14.     In exchange for the forgoing, and provided Debtors' Plan is in compliance with this Stipulation, Creditor shall provide a ballot voting in favor of the Debtors' Chapter 11 Plan of Reorganization for the Secured Claim.

Dated: December 14, 2020          **ANGSTMAN JOHNSON, PLLC**


By:/s/ *Matthew Todd Christensen*
MATTHEW TODD CHRISTENSEN
Attorney for Debtors


Dated: December 14, 2020          **ALDRIDGE PITE, LLP**


By: /s/ *Jesse A.P. Baker*
JESSE A.P. BAKER (SBN 8411)
Attorneys for Wells Fargo Bank, N.A.

# EXHIBIT B

## CHAPTER 11 MONTHLY OPERATING REPORT

Case No. 19-40057-JMM                          Report Month/Year  20-Nov-20

Debtor      Timothy D Semones and Susan C Desko                    (Period 10-1 to 10-31)

This report is due 21 days after the end of the month. Debtor must attach each of the required forms or documents unless the U.S. Trustee has waived the requirement. The report must be filed with the Court.

| The debtor has provided the following with this monthly operating report: | Yes | No |
|---|---|---|
| **UST-2A**  **Comparative Balance Sheet** | X | ❏ |
| **UST-2B**  **Comparative Income Statement** | X | ❏ |
| **UST-2C**  **Cash Receipts and Disbursements Statement** | X | ❏ |
| **UST-2C Continuation Sheet for Each Account** | X | ❏ |
| **Detailed List of Receipts and Disbursements for Each Account** | X | ❏ |
| **Bank Statement for Each Account** | X | ❏ |
| **Bank Reconciliation for Each Account** | X | ❏ |
| **UST-2D**  **Supplemental Information** | X | ❏ |

*I declare under penalty of perjury that this Monthly Operating Report, and any attachments thereto are true, accurate and correct to the best of my knowledge and belief.*

Date:  /1-20-20

Name: Timothy D Semones

Signature:

Name: Susan C Desko

Signature:

United States Trustee-District of Idaho

UST-2
December 2017

## CHAPTER 11 MONTHLY OPERATING REPORT - COMPARATIVE BALANCE SHEET

| Case No. | 19-40057-JMM | Report Month/Year | 20-Nov-20 |
|---|---|---|---|
| Debtor | Timothy D Semones & Susan C Desko | | (Period 10-1 to 10-31) |

| | Current Month | Petition Date |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash | $ 881 | $ 290,464 |
| Other Current Assets :(List) | | |
| Fidelity 401-K | 879 | 879 |
| Legal Retainer | 34,178 | 34,178 |
| Total Current Assets | 35,057 | 35,057 |
| Other Assets: | | |
| 105 Madison Ave | 700,000 | 800,000 |
| Business Entities | 90,709 | 650,000 |
| Form 106 A/B Vehicles | 132,847 | 153,100 |
| Form 106 A/B Personal Items | 21,000 | 21,000 |
| Total Other Assets | 944,556 | 1,624,100 |
| **TOTAL ASSETS** | $ 980,494 | 1,949,621 |
| **LIABILITIES** | | |
| Post-petition Notes Payable | 0 | 0 |
| Other Post-petition Payables (List):   Angstman-Johnson Legal Fees | 48,291 | |
| Total Post Petition Liabilities | 48,291 | 0 |
| Pre Petition Liabilities: | | |
| Secured Debt | 561,400 | 595,642 |
| Unsecured Debt and Personal Guarantees | 2,206,353 | 4,042,531 |
| Total Pre Petition Liabilities | 2,767,753 | 4,638,173 |
| **TOTAL LIABILITIES** | 2,816,044 | 4,638,173 |
| **OWNERS' EQUITY** | | |
| Owner's/Stockholder's Equity | (2,856,899) | (2,472,077) |
| Retained Earnings - Prepetition | (519,282) | (158,810) |
| Retained Earnings - Post-petition | 1,540,632 | (57,665) |
| **TOTAL OWNERS' EQUITY** | (1,835,549) | (2,688,552) |
| **TOTAL LIABILITIES AND OWNERS' EQUITY** | $ 980,494 | $ 1,949,621 |

*Explain any significant changes on Form UST-2D, Supplemental Information*

## CHAPTER 11 MONTHLY OPERATING REPORT - COMPARATIVE INCOME STATEMENT
### (Non-Business Debtor)

| Case No. | 19-40057-JMM | Report Month/Year | 20-Nov-20 |
|---|---|---|---|
| Debtor | Timothy D Semones & Susan C Desko | | (Period 10-1 to 10-31) |

|  | Current Month | Total Post-Petition |
|---|---|---|
| **INCOME** | | |
| Est. Net Wages (Semones) | $ 0 | $ 12000 |
| Est. Net Wages (Desko) | 0 | 143000 |
| Interest | 0 | 5589.55 |
| Sale of Assets | | |
| Post-Petition Borrowing | | |
| Other: US Treasury Covid | 0 | 2400 |
| Other: | | |
| **TOTAL INCOME** | $ 0 | $ 162989.55 |
| **EXPENSES** | | |
| Mortgage Payments 105 Madison Ave | 0 | 63076.03 |
| Home Equity Payments 105 Madison Ave | 0 | 8540.87 |
| Other Secured Debt Payments | 0 | 0 |
| Personal Living Expenses - Utilities | 0 | 4076.59 |
| Personal Living Expenses - Groceries, Personal | 1121.68 | 24110.49 |
| Personal Living Expenses - Auto (Insurance, Gas, Maintenance) | 207.32 | 4640.6 |
| Personal Living Expenses - Health Insurance, Medical | 1368.67 | 27073.5 |
| Personal Living Expenses - Spending/Misc | 0 | 944.84 |
| 29 Lake Creek Construction Expenses | 0 | 256316.7 |
| 29 Lake Creek 1st Mortgage (I/O) | 0 | 55247.1 |
| Professional Fees* | 0 | 48290.77 |
| UST Quarterly Fees | 0 | 5850 |
| Other: Retired Assets and Liabilities | 0 | -1626300 |
| Other: Assets and Liabilities Adjustments | 0 | 50602.5 |
| Other: Payout of UMTA Trust Account to Holder | 0 | 2695.1 |
| **TOTAL EXPENSES** | $ 2697.67 | $ -1074834.91 |
| **NET INCOME** | $ -2697.67 | $ 1237824.46 |

UST-2B
Non-Business
December 2017

## CHAPTER 11 MONTHLY OPERATING REPORT -
## CASH RECEIPTS AND DISBURSEMENTS STATEMENT-Continuation Sheet

Case No.    19-40057-JMM                                      Report Month/Year         20-Nov-20
Debtor      Timothy D Semones & Susan C Desko                                    (Period 10-1 to 10-31)

Prepare this CONTINUATION SHEET for each bank account and attach supporting documents as indicated on the checklist below.

**Depository (bank) name:**    First Federal DIP
**Account number:**    x-2658

| | | | | |
|---|---|---|---|---|
| Beginning cash balance, per Debtor's books | | $ $ | 3,578.96 | |
| | | | | |
| Add: | Transfers in from other estate bank accounts | | 0 | |
| | Cash receipts deposited to this account | $ | - | |
| | | | | |
| Subtract: | Transfers out to other estate bank accounts | | 0 | |
| | **Cash disbursements** from this account | $ | 2,697.67 | |
| | | | | |
| Adjustments, if any (explain) | | | | |
| | (Net Account interest, Bank Fees, Securities increases) | $ | - | |
| | | | | |
| **Net cash flow** | | $ $ | (2,697.67) | |
| (receipts and transfers in less disbursements and transfers out) | | | | |
| | | | | |
| **Ending cash balance, per Debtor's books** | | $ $ | 881.29 | |
| (beginning balance plus net cash flow) | | | | |

| Does this CONTINUATION SHEET include the following supporting documents? | Yes | No |
|---|---|---|
| • Detailed list of receipts and disbursements | ❏ | X |
| • Bank statement | X | ❏ |
| • Bank reconcilation | ❏ | X |

## CHAPTER 11 MONTHLY OPERATING REPORT -
## CASH RECEIPTS AND DISBURSEMENTS STATEMENT

| Case No. | 19-40057-JMM | Report Month/Year | 20-Nov-20 |
|---|---|---|---|
| Debtor | Timothy D Semones & Susan C Desko | | (Period 10-1 to 10-31) |

| **SUMMARY** | Current Month | Total Post-Petition |
|---|---|---|
| **Beginning cash balance, per Debtor's books (all acccounts)** | $ 3578.96 | $ 290463.56 |
| **Total cash receipts** (from UST-2C continuation sheets) | $ - | $ 211,148.10 |
| **Total cash disbursements** from (UST-2C continuation sheets) | 2697.67 | 500730.37 |
| **Net cash flow** (Total cash receipts less total cash disbursements) | $ -2697.67 | -289582.27 |
| **Ending cash balance, per Debtor's books (all accounts)** | $ 881.29 | $ 881.29 |

*Attach a UST-2C continuation sheet for each bank account and for any petty cash account.*

UST-2C
December 2017

## CHAPTER 11 MONTHLY OPERATING REPORT -
### CASH RECEIPTS AND DISBURSEMENTS STATEMENT-Continuation Sheet

| Case No. | 19-40057-JMM | Report Month/Year | 20-Nov-20 |
|---|---|---|---|
| Debtor | Timothy D Semones & Susan C Desko | | (Period 10-1 to 10-31) |

Prepare this CONTINUATION SHEET for each bank account and attach supporting documents as indicated on the checklist below.

**Depository (bank) name:** First Federal DIP
**Account number:** x-2658

| | | | |
|---|---|---|---|
| **Beginning cash balance, per Debtor's books** | | $ $ | 3,578.96 |
| Add: | Transfers in from other estate bank accounts | | 0 |
| | Cash receipts deposited to this account | $ | - |
| Subtract: | Transfers out to other estate bank accounts | | 0 |
| | **Cash disbursements** from this account | $ | 2,697.67 |
| Adjustments, if any (explain) | | | |
| (Net Account interest, Bank Fees, Securities increases) | | $ | - |
| **Net cash flow** | | $ $ | (2,697.67) |
| (receipts and transfers in less disbursements and transfers out) | | | |
| **Ending cash balance, per Debtor's books** | | $ $ | 881.29 |
| (beginning balance plus net cash flow) | | | |

| Does this CONTINUATION SHEET include the following supporting documents? | Yes | No |
|---|---|---|
| • Detailed list of receipts and disbursements | ❑ | X |
| • Bank statement | X | ❑ |
| • Bank reconcilation | ❑ | X |

UST-2C
Continuation Sheet
December 2017

**Tim Semones and Susan Desko Case 19-40057**

9:28 AM

**Account QuickReport**

11/20/2020

**As of October 31, 2020**

Accrual Basis

| | Type | Date | Num | Name | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|
| **First Federal DIP** | | | | | | | | 3,578.96 |
| | Check | 10/02/2020 | | Select Health | | Health and Medical | -1,368.67 | 2,210.29 |
| | Check | 10/10/2020 | 105 | Atkinson's | | Groceries | -1,121.68 | 1,088.61 |
| | Check | 10/26/2020 | | Progressive Insurance | | Insurance | -207.32 | 881.29 |
| **Total First Federal DIP** | | | | | | | -2,697.67 | 881.29 |
| **TOTAL** | | | | | | | -2,697.67 | 881.29 |

## CHAPTER 11 MONTHLY OPERATING REPORT - SUPPLEMENTAL INFORMATION

Case No._____ 19-40057-JMM

Debtor_____ Timothy D Semones and Susan C Desko

Report Month/Year  Nov 20, 2020

Period 10-1 to 10-31

### Reconciliation of Unpaid Post-Petition Taxes

| Type of tax | 1<br>Unpaid post-petition taxes from prior reporting month | 2<br>Post-petition taxes accrued this month (new obligations) | 3<br>Post-petition tax payments made this reporting month | 4<br>Unpaid post-petition taxes at end of reporting month (col. 1+2-3) |
|---|---|---|---|---|
| **Federal** | | | | |
| Employee income tax withheld | | | | 0 |
| Employee FICA taxes withheld | | | | 0 |
| Employer FICA taxes | | | | 0 |
| Unemployment taxes | | | | 0 |
| Other: | | | | 0 |
| **State** | | | | |
| Sales, use & excise taxes | | | | 0 |
| Unemployment taxes | | | | 0 |
| Other: | | | | 0 |
| **Local** | | | | |
| Personal property taxes | | | | 0 |
| Real property taxes | | | | 0 |
| Other: | | | | 0 |
| | | | **Total unpaid post-petition taxes** | 0 |

### Payments to Attorneys and Other Professionals (requires court approval)

| Professional's name | Type of services | Amount paid this month | Date of court approval | Balance unpaid at end of month, net of retainer |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### Payments to Principals of Debtor and Other Insiders (includes officers, directors, shareholders, partners, members, relatives, etc.)

| Payee's name | Position with or relationship to Debtor | Amount paid this month | Purpose of payment (e.g., wages or salary, expense reimbursement, loan repayment, |
|---|---|---|---|
| N/A | | | |
| | | | |
| | | | |
| | | | |

### Insurance Coverage Summary

| Type of insurance | Insurance carrier | Amount of coverage | Policy expiration date | Premium paid through date |
|---|---|---|---|---|
| Workers' compensation | | | | |
| General liability | | | | |
| Property (fire, theft, etc.) | Safeco | | Jun-21 | |
| Vehicle | Progressive | | Feb-21 | |
| Other: | | | | |
| Other: | | | | |
| *If any policies were renewed or replaaced during reporting period, attach new certificate of insurance.* | | | | |

United States Trustee-District of Idaho

UST-2D
Page 1 of 2
December 2017

## CHAPTER 11 MONTHLY OPERATING REPORT - SUPPLEMENTAL INFORMATION

Case No. _____ 19-40057-JMM

Debtor _____ Timothy D Semones and Susan C Desko

Report Month/Year  Nov 20, 2020

Period 10-1 to 10-31

### Accounts Receivable Aging Summary (attach detailed aging report)

|  | 30 days or less | 31 to 60 days | 61 to 90 days | Over 90 days | Total at month end |
|---|---|---|---|---|---|
| Pre-petition receivables |  |  |  |  | 0 |
| Post-petition receivables |  |  |  |  | 0 |
| Total | 0 | 0 | 0 | 0 | 0 |

### Post-Petition Accounts Payable Aging Summary (attach detailed aging report)

|  | 30 days or less | 31 to 60 days | 61 to 90 days | Over 90 days | Total at month end |
|---|---|---|---|---|---|
| Trade Payables |  |  |  |  | 0 |
| Other Payables |  |  |  |  | 0 |
| Total | 0 | 0 | 0 | 0 | 0 |

### Personnel Changes

|  | Full-time | Part-time |
|---|---|---|
| Number of employees at beginning of month |  |  |
| Number of employees at end of month |  |  |

### Other Information

|  | Yes | No |
|---|---|---|
| **Payment of Pre-Petition Debts**<br>Did Debtor pay any unsecured pre-petition debts during the reporting month? *If yes, attach a detailed explanation including the payee, amount paid, and date of court approval.* | ❑ | X |
| **Sale of Assets**<br>Did Debtor, or another party on behalf of Debtor, sell, transfer, or otherwise dispose of any assets outside of the ordinary course of Debtor's business during the reporting month? *If yes, attach a report of sale or settlement statement, or detailed explanation including description of asset sold, purchase, sale price, net proceeds received, and date of court approval* . | ❑ | X |
| **Post-Petition Financing**<br>Did Debtor borrow any money outside of the ordinary course of business during the reporting month? *If yes, attach a detailed explanation including the name of the lender, the amount borrowed, and the date of court approval.* | ❑ | X |

### Narrative

*Provide a brief description of any significant business and legal actions taken by the debtor, its creditors, or the court during the reporting period; any unusual or non-recurring accounting transactions that are reported in the financial statements; any significant changes in the financial condition of the debtor; and any progress made toward confirmation of a plan during the month.*

WF Mortgage for 105 Madison Ave is currently in Covid forebearance

# EXHIBIT C

**CHAPTER 11 NON-BUSINESS DEBTOR**
**12-Month Projection (w/ Semones income)**
**Tim Semones and Susan Desko; Case No. 19-40057-JMM**

| | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Account Balance | | | | | | | | | | | | |
| **CASH RECEIPTS** | | | | | | | | | | | | |
| Est. Net Wages (Semones) | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 | $5,250 |
| Est. Net Wages (Desko) | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 |
| Interest | | | | | | | | | | | | |
| Sale of Assets | | | | $65,000 | | | | | | | | |
| Post-Petition Borrowing | | | | | | | | | | | | |
| Other: _____ | | | | | | | | | | | | |
| **TOTAL CASH RECEIPTS:** | $15,750 | $15,750 | $15,750 | $80,750 | $15,750 | $15,750 | $15,750 | $15,750 | $15,750 | $15,750 | $15,750 | $15,750 |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | |
| Mortgage Payments (105 Madison) | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 |
| Repay COVID forebearance (105 Madison) | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 |
| HELOC payments (105 Madison) | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 |
| Utilities | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Groceries, Medical Personal | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 | $1,200 |
| Auto (Insurance, Gas Maintenance) | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 |
| Health Insurance | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 | $1,450 |
| Spending/Misc | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Professional Fees* | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| UST Quarterly Fees | $975 | $0 | $0 | $975 | $0 | $0 | $975 | $0 | $0 | $0 | $0 | $0 |
| Plan Payment | $4,750 | $4,750 | $4,750 | $69,750 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 | $4,750 |
| **TOTAL CASH DISBURSEMENTS** | $16,254 | $15,279 | $15,279 | $81,254 | $15,279 | $15,279 | $16,254 | $15,279 | $15,279 | $15,279 | $15,279 | $15,279 |
| **NET CASH FLOW** | -$504 | $471 | $471 | -$504 | $471 | $471 | -$504 | $471 | $471 | $471 | $471 | $471 |

**CHAPTER 11 NON-BUSINESS DEBTOR**
**12-Month Projection (w/ Semones income)**
**Tim Semones and Susan Desko; Case No. 19-40057-JMM**

| | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Account Balance | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| CASH RECEIPTS | | | | | | | | | | | | |
| Est. Net Wages (Semones) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Est. Net Wages (Desko) | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 |
| Interest | | | | | | | | | | | | |
| Sale of Assets | | | | $65,000 | | | | | | | | |
| Post-Petition Borrowing | | | | | | | | | | | | |
| Other: _____ | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| TOTAL CASH RECEIPTS: | $10,500 | $10,500 | $10,500 | $75,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 | $10,500 |
| | | | | | | | | | | | | |
| CASH DISBURSEMENTS | | | | | | | | | | | | |
| Mortgage Payments (105 Madison) | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 | $4,075 |
| Repay COVID forebearance (105 Madison) | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 | $804 |
| HELOC payments (105 Madison) | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 | $700 |
| Utilities | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| Groceries, Medical Personal | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 |
| Auto (Insurance, Gas Maintenance) | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 |
| Health Insurance | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 | $800 |
| Spending/Misc | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 | $300 |
| Professional Fees* | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| UST Quarterly Fees | $975 | $0 | $0 | $975 | $0 | $0 | $975 | $0 | $0 | $0 | $0 | $0 |
| Plan Payment | $500 | $500 | $500 | $65,500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| | | | | | | | | | | | | |
| TOTAL CASH DISBURSEMENTS | $10,754 | $9,779 | $9,779 | $75,754 | $9,779 | $9,779 | $10,754 | $9,779 | $9,779 | $9,779 | $9,779 | $9,779 |
| | | | | | | | | | | | | |
| NET CASH FLOW | -$254 | $721 | $721 | -$254 | $721 | $721 | -$254 | $721 | $721 | $721 | $721 | $721 |

# EXHIBIT D

SEMONES/DESKO HYPOTHETICAL LIQUIDATION ANALYSIS

| RESIDENCE | FMV | 1ST DOT | 2ND DOT | EXEMPTIONS | NON-EXEMPT EQUITY | LIQUIDATION VALUE TO ESTATE | Notes |
|---|---|---|---|---|---|---|---|
| 105 Madison Ave, Ketchum ID 83340 | $700,000.00 | $498,003.00 | $106,000.00 | $100,000.00 | -$4,003.00 | $0.00 | (5), (6), (7) |

| OTHER REAL PROPERTY | FMV | 1ST DOT | 2ND DOT | EXEMPTIONS | NON-EXEMPT EQUITY | | |
|---|---|---|---|---|---|---|---|
| None | $0.00 | | | | $0.00 | $0.00 | |

| BUSINESSES | VALUE OF DEBTOR'S INTEREST | | | EXEMPTIONS | NON-EXEMPT VALUE | | |
|---|---|---|---|---|---|---|---|
| Inphi Partners, LLC | $      191,000.00 | | | | | $              - | |
| Susan Desko PC (100%) | $57,695.00 | | | $0.00 | $57,695.00 | $57,695.00 | (1) |
| SD Consulting, Inc. (aka Venture Consultants) (100%) | $12,875.00 | | | $0.00 | $12,875.00 | $12,875.00 | (1) |

| PERSONAL PROPERTY | FMV | | | EXEMPTIONS | NON-EXEMPT VALUE | | |
|---|---|---|---|---|---|---|---|
| CASH | $0.00 | | | | $0.00 | $0.00 | |
| DIP Checking (First Federal) | $3,578.96 | | | $0.00 | $3,578.96 | $3,578.96 | |
| Wells Fargo accts | $0.00 | | | $0.00 | $0.00 | $0.00 | |
| HHG | $21,000.00 | | | $12,100.00 | $8,900.00 | $6,675.00 | (3) |
| RETIREMENT ACCOUNT | $880.00 | | | $880.00 | $0.00 | $0.00 | |
| AUTO - PORSCHE 911 | $52,396.00 | | | $0.00 | $52,396.00 | $39,297.00 | (3), (8) |
| AUTO - AMG HUMMER | $30,000.00 | | | $0.00 | $30,000.00 | $22,500.00 | (3), (8) |
| AUTO - VOLKSWAGEN | $6,000.00 | | | $0.00 | $6,000.00 | $4,500.00 | (3), (8) |
| AUTO - MERCEDES | $27,568.00 | | | $14,000.00 | $13,568.00 | $10,176.00 | (3), (8) |
| AUTO - JEEP WRANGLER | $7,668.00 | | | $0.00 | $7,668.00 | $5,751.00 | (3), (8) |
| AUTO - SUBURBAN | $1,352.00 | | | $0.00 | $1,352.00 | $1,014.00 | (3), (8) |
| AUTO - HARLEY DAVIDSON | $7,762.50 | | | $0.00 | $7,762.50 | $5,821.88 | (3), (8) |
| AUTO - TRAILER | $100.00 | | | $0.00 | $100.00 | $75.00 | (3), (8) |

| | | |
|---|---|---|
| TOTAL AVAILABLE FROM POTENTIAL CHAPTER 7 LIQUIDATION | $169,958.84 | |
| Chapter 7 Trustee Compensation | $11,747.94 | (4) |
| TOTAL POTENTIAL CHAPTER 7 DISTRIBUTION | $158,210.89 | |

Notes:
Note 1: Value of business interests (SD Consulting; Susan Desko PC) is based on Sept 30, 2020 cash balance and 2015.3 reports.
Note 2: Value of Inphi Partners, LLC, interest is based on the amount of funds currently held by the US Marshal from the sale of the 29 Lake Creek property.
Note 3: Liquidation value of personal property assumes a 25% discount and transaction cost.
Note 4: Chapter 7 Trustee fees are calculated using the standard Trustee fee calculation
Note 5: Current value of 105 Madison residence is based on recent BPO value and Property Tax Assessment
Note 6: 1st Mortgage Balance includes COVID forebearance from April 2020 through Dec 2020
Note 7: Assumed cost to liquidate 105 Madison is 10% (5% price concession + 5% RE/transaction cost)
Note 8: Automobile values from Kelly Blue Book (Private Sale Transaction)

EXHIBIT E

Matthew T. Christensen, ISB: 7213
Chad R. Moody, ISB: 9946
ANGSTMAN JOHNSON
199 N. Capitol Blvd., Ste. 200
Boise, ID 83702
Phone: (208) 384-8588
Fax: (208) 629-2157
Email: mtc@angstman.com
        chad@angstman.com

Attorneys for Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| In re: | Case No. 19-40057-JMM |
|---|---|
| TIMOTHY D. SEMONES and SUSAN C. DESKO, | Chapter 11 |
| Debtors. | |

## FOURTH PERIODIC REPORT REGARDING VALUE, OPERATIONS AND PROFITABILITY OF ENTITIES IN WHICH THE ESTATE OF TIMOTHY D. SEMONES AND SUSAN C. DESKO HOLD A SUBSTANTIAL OR CONTROLLING INTEREST

This is the fourth report on the value, operations and profitability of those entities in which the estate holds a substantial or controlling interest, as required by Bankruptcy Rule 2015.3. The estate of Timothy D. Semones and Susan C. Desko holds a substantial or controlling interest in the following entities ("Controlled Non-Debtor Entities"):

| Name of Entity | Interest of the Estate | Tab # |
|---|---|---|
| Inphi Partners, LLC | 100% | 1 |
| SD Consulting, Inc., d/b/a Venture Consultants | 100% | 2 |
| Susan Desko, PC | 100% | 3 |

FOURTH PERIODIC REPORT REGARDING VALUE, OPERATIONS AND
PROFITABILITY OF ENTITIES IN WHICH THE ESTATE OF TIMOTHY D. SEMONES
AND SUSAN C. DESKO HOLD A SUBSTANTIAL OR CONTROLLING INTEREST –
PAGE 1

This fourth periodic report (the "Periodic Report") contains reporting ("Fourth Entity Report") on the value, operations, and profitability of the listed entity above for the 6-month period, January through June 2020, which follows the third periodic report filed on March 16, 2020 (Dkt No. 110), the second periodic report filed on September 16, 2019 (Dkt. No. 65), and the initial periodic report filed on February 22, 2019 (Dkt No. 23) which was later amended on March 18, 2019 (Dkt. No. 28). Pursuant to Bankruptcy Rule 2015.3(a) and the Official Form 426, the Fourth Entity Report consists of the following five exhibits for each Controlled Non-Debtor Entity.

**Exhibit A** contain the most recently available: balance sheet, statement of income (loss), statement of cash flows, and a statement of changes in shareholders' or partners' equity (deficit) for the period covered by the Entity Report, along with summarized footnotes.

**Exhibit B** describes the Controlled Non-Debtor Entity's business operations.

**Exhibit C** describes claims between the Controlled Non-Debtor Entity and any other Controlled Non-Debtor Entity.

**Exhibit D** describes how federal, state, or local taxes, and any tax attributes, refunds, or other benefits, have been allocated between or among the Controlled Non-Debtor Entity and any Debtor or any other Controlled Non-Debtor Entity and includes a copy of each tax sharing or tax allocation agreement to which the Controlled Non-Debtor Entity is a party with any other Controlled Non-Debtor Entity.

**Exhibit E** describes any payment, by the Controlled Non-Debtor Entity, of any claims, administrative expenses, or professional fees that have been or could be asserted against any Debtor, or the incurrence of any obligation to make such payments, together with the reason for the entity's payment thereof or incurrence of any obligation with respect thereto.

THIS REPORT MUST BE SIGNED BY A REPRESENTATIVE OF THE TRUSTEE
OR DEBTOR IN POSSESSION

The undersigned, having reviewed the Fourth Entity Report for Controlled Non-Debtor Entity, and being familiar with the Debtor's financial affairs, verifies under the penalty of perjury

FOURTH PERIODIC REPORT REGARDING VALUE, OPERATIONS AND
PROFITABILITY OF ENTITIES IN WHICH THE ESTATE OF TIMOTHY D. SEMONES
AND SUSAN C. DESKO HOLD A SUBSTANTIAL OR CONTROLLING INTEREST –
PAGE 2

that to the best of his knowledge, (i) this Periodic Report and the attached Fourth Entity Reports

are complete, accurate, and truthful to the best of his knowledge, and (ii) the Debtor did not

cause the creation of any entity with actual deliberate intent to evade the requirements of

Bankruptcy Rule 2015.3

DATED this 18th day of September 2020.


TIMOTHY D. SEMONES
Debtor in Possession


SUSAN C. DESKO
Debtor in Possession


FOURTH PERIODIC REPORT REGARDING VALUE, OPERATIONS AND
PROFITABILITY OF ENTITIES IN WHICH THE ESTATE OF TIMOTHY D. SEMONES
AND SUSAN C. DESKO HOLD A SUBSTANTIAL OR CONTROLLING INTEREST –
PAGE 3

# TAB 1

# Inphi Partners, LLC

## EXHIBIT A

### Financial Statements for Inphi Partners, LLC

**A-1:   Balance Sheet for Inphi Partners, LLC**

**A-2:   Statement of Income for Inphi Partners, LLC**

**A-3:   Statement of Cash Flows for Inphi Partners, LLC**

**A-4:   Statement of Changes in Member Equity for Inphi Partners, LLC**

Source of information: The financial statements listed above and provided herein are generated from records kept by Inphi Partners, LLC and based on the personal knowledge of Timothy Semones, owner of Inphi Partners, LLC.

Debtor in Possession.

# EXHIBIT A-1

## <u>Balance Sheet for Inphi Partners, LLC</u>

As of June 30, 2020

(Attached)

**Inphi Partners LLC Construction Account**

## Balance Sheet

**As of June 30, 2020**

|  | Jun 30, 20 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| Zion's Bank Checking | 38.81 |
| **Total Checking/Savings** | 38.81 |
| **TOTAL ASSETS** | **38.81** |

**EXHIBIT A-2**

**Statement of Income for Inphi Partners, LLC**

January through June 2020

    Given the nature of the business, Inphi Partners, LLC does not have a statement of Income. Rather, Inphi Partners, LLC. keeps reports of expense and development costs, which are reflected on the attached Profit & Loss report.

(Attached)

**Inphi Partners LLC Construction Account**

## Profit & Loss

**January through June 2020**

|  | Jan - Jun 20 |
|---|---|
| **Income** | |
| **Loans from Shareholders** | 5,000.00 |
| **Total Income** | 5,000.00 |
| **Gross Profit** | 5,000.00 |
| **Expense** | |
| **DIVISION 01 GENERAL REQUIREMENT** | 6,105.37 |
| **DIVISION 06 WOOD AND PLASTIC** | 107.00 |
| **DIVISION 08 OPENINGS** | 104.80 |
| **DIVISION 16 ELECTRICAL AND COMM** | 1,117.92 |
| **DIVISION 31 EXCAVATION AND SITE** | 1,180.00 |
| **Total Expense** | 8,615.09 |
| **Net Income** | -3,615.09 |

**EXHIBIT A-3**

**Statement of Cash Flows for Inphi Partners, LLC**

      Given the nature of the business, Inphi Partners, LLC does not have separate Statement of Cash Flows. Please see Exhibit A-2.

**EXHIBIT A-4**

**Statement of Changes in Member Equity for Inphi Partners, LLC**

Given the nature of the business, changes in owners' equity would be reflected in the changes in the expenses added to the project. Please see Exhibit A-2.

**EXHIBIT B**

**Description of Operations for Inphi Partners, LLC**

Inphi Partners, LLC is a single asset Idaho LLC that was formed to develop the real estate at 27 Lake Creek Drive and 29 Lake Creek Drive. This project has since been sold.  See Report of Sale of Property, Dkt. No. 125.  Tim Semones is the sole member of Inphi Partners, LLC.

Source of information: based on the personal knowledge of Timothy Semones, owner of Inphi Partners, LLC.

**EXHIBIT C**

**Description of Intercompany Claims**

There are no claims by Inphi Partners, LLC against any other Controlled Non-Debtor Entity.

Source of information: based on the personal knowledge of Timothy Semones, owner of Inphi Partners, LLC.

## EXHIBIT D

## <u>Allocation of Tax Liabilities and Assets</u>

There are no tax sharing or tax allocation agreements by Inphi Partners, LLC to which the entity is a party with any other Controlled Non-Debtor Entity.

Source of information: based on the personal knowledge of Timothy Semones, owner of Inphi Partners, LLC.

**EXHIBIT E**

**Description of Controlled Non-Debtor Entity's Payments of Administrative Expenses, Or Professional Fees Otherwise Payable by Debtor**

There are no payments made, or obligations incurred (or claims purchased) by Inphi Partners, LLC in connection with any claims, administrative expenses, or professional fees that have been or could be asserted against the Debtor.

Source of information: based on the personal knowledge of Timothy Semones, owner of Inphi Partners, LLC.

TAB 2

SD Consulting, Inc., d/b/a
Venture Consultants ("SD
Consulting")

# EXHIBIT A

## Financial Statements for SD Consulting, Inc.

**A-1:   Balance Sheet for SD Consulting, Inc.**

**A-2:   Statement of Income for SD Consulting, Inc.**

**A-3:   Statement of Cash Flows for SD Consulting, Inc.**

**A-4:   Statement of Changes in Member Equity for SD Consulting, Inc.**

Source of information: The financial statements listed above and provided herein are generated from records kept by SD Consulting, Inc. and are based on the personal knowledge of Timothy Semones, owner of SD Consulting, Inc.

**EXHIBIT A-1**

**Balance Sheet for SD Consulting, Inc.**

As of June 30, 2020

(Attached)

| SD Consulting | 11:14 AM |
| **Balance Sheet** | **09/13/2020** |
| As of June 30, 2020 | Accrual Basis |

|  | Jun 30, 20 |
| --- | --- |
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **Checking WF SDC** | 16,336.13 |
| **Checking WF VC** | 3,661.32 |
| **Total Checking/Savings** | 19,997.45 |
| **Total Current Assets** | 19,997.45 |
| **TOTAL ASSETS** | **19,997.45** |

**EXHIBIT A-2**

**Statement of Income for SD Consulting, Inc.**

January through June 2020

    Given the nature of the business, SD Consulting, Inc. does not have a statement of Income. Rather, SD Consulting, Inc. keeps reports of expense and development costs, which are reflected on the attached Profit & Loss report.

(Attached)

### SD Consulting
## Profit & Loss
#### January through June 2020

|  | Jan - Jun 20 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| Services Income | 102,200.00 |
| **Total Income** | 102,200.00 |
| **Cost of Goods Sold** | |
| Business Consultants | 42,420.00 |
| **Total COGS** | 42,420.00 |
| **Gross Profit** | 59,780.00 |
| **Expense** | |
| Automotive | 9,011.38 |
| Bank Service Charges | 141.33 |
| Cellular | 2,550.23 |
| Cloud, Internet Expenses | 2,001.58 |
| Computer Equipment | 440.61 |
| Health Related | 980.05 |
| Office Supplies | 1,724.74 |
| Personal Spending | 3,130.80 |
| Professional Fees | 771.10 |
| Research Tools | 351.39 |
| Storage Units | 1,710.00 |
| Travel Expense | 2,156.71 |
| Tuition Expenses | 24,420.37 |
| Utilities | 795.00 |
| **Total Expense** | 50,185.29 |
| **Net Ordinary Income** | 9,594.71 |
| **Net Income** | **9,594.71** |

**EXHIBIT A-3**

**Statement of Cash Flows for SD Consulting, Inc.**

Given the nature of the business, SD Consulting, Inc. does not have separate Statement of Cash Flows. Please see Exhibit A-2.

**EXHIBIT A-4**

**Statement of Changes in Member Equity for SD Consulting, Inc.**

SD Consulting, Inc. does not have a separate Statement of Changes in Member Equity. Please refer to the balance sheet, Exhibit A-1.

# EXHIBIT B

## <u>Description of Operations for SD Consulting, Inc.</u>

      SD Consulting, Inc. is a service business providing valuation services for venture-backed startups in technology, life sciences, and media, to set fair market value for granting employee stock options. These valuations are referred to as 409A valuations. SD Consulting are experts in such Private Securities Valuation and IRS Section 409A. Engagements are $2500 to $4000 depending on complexity. SD Consulting, Inc. employs one contractor who works for 40% of services revenue. Tim Semones is the sole shareholder of SD Consulting, Inc.

Source of information: based on the personal knowledge of Timothy Semones, owner of SD Consulting, Inc.

**EXHIBIT C**

**Description of Intercompany Claims**

There are no claims by SD Consulting against any other Controlled Non-Debtor Entity.


Source of information: based on the personal knowledge of Timothy Semones, owner of SD Consulting, Inc.

**EXHIBIT D**

**Allocation of Tax Liabilities and Assets**

There are no tax sharing or tax allocation agreements by SD consulting to which the entity is a party with any other Controlled Non-Debtor Entity.

Source of information: based on the personal knowledge of Timothy Semones, owner of SD Consulting, Inc.

**EXHIBIT E**

**Description of Controlled Non-Debtor Entity's Payments of Administrative Expenses, Or
Professional Fees Otherwise Payable by Debtor**

There are no payments made, or obligations incurred (or claims purchased) by SD
Consulting in connection with any claims, administrative expenses, or professional fees that have
been or could be asserted against any Debtor.

Source of information: based on the personal knowledge of Timothy Semones, owner of SD
Consulting, Inc.

TAB 3

Susan Desko, PC

**EXHIBIT A**

**Financial Statements for Susan Desko, PC**

**A-1:**    **Balance Sheet for Susan Desko, PC**

**A-2:**    **Statement of Income for Susan Desko, PC**

**A-3:**    **Statement of Cash Flows for Susan Desko, PC**

**A-4:**    **Statement of Changes in Member Equity for Susan Desko, PC**

Source of information: The financial statements listed above and provided herein are generated from records kept by Susan Desko, PC and are based on the personal knowledge of Timothy Semones and Susan Desko, owners of Susan Desko, PC.

**EXHIBIT A-1**

**Balance Sheet for Susan Desko, PC**

As of June 30, 2020

(Attached)

**Architect Susan Desko AIA**

**Balance Sheet**

**As of June 30, 2020**

9:40 AM

09/14/2020

Accrual Basis

|  | Jun 30, 20 |
|---|---|
| **ASSETS** | |
|    **Current Assets** | |
|       **Checking/Savings** | |
|          WF Checking | 82,318.27 |
|       **Total Checking/Savings** | 82,318.27 |
| **TOTAL ASSETS** | **82,318.27** |

**EXHIBIT A-2**

**Statement of Income for Susan Desko, PC**

January through June 2020

     Given the nature of the business, Susan Desko, PC does not have a statement of Income. Rather, Susan Desko, PC keeps reports of expense and development costs, which are reflected on the attached Profit & Loss report.

(Attached)

**Architect Susan Desko AIA**

## Profit & Loss

**January through June 2020**

12:19 PM

09/14/2020

Accrual Basis

|  | Jan - Jun 20 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Client Reimbursable Expenses | 14,790.99 |
| Design Income | 130,484.90 |
| Owner Direct Expenses | 26,777.24 |
| **Total Income** | 172,053.13 |
| **Cost of Goods Sold** | |
| Client Expenses | 41,929.00 |
| Design Labor | 10,124.50 |
| **Total COGS** | 52,053.50 |
| **Gross Profit** | 119,999.63 |
| **Expense** | |
| Automobile Expense | 1,794.40 |
| Bank Service Charges | 167.45 |
| DIP Account Funding | 13,827.33 |
| Groceries | 5,387.78 |
| Insurance Expense | 2,737.34 |
| Office Expenses | 9,699.56 |
| Personal Expenses | 4,198.45 |
| Professional Fees | 6,411.99 |
| Rent & Utilities | 18,733.31 |
| Travel Expenses | 19,358.30 |
| Tuition and Expenses | 24,475.00 |
| **Total Expense** | 106,790.91 |
| **Net Ordinary Income** | 13,208.72 |
| **Net Income** | 13,208.72 |

**EXHIBIT A-3**

**Statement of Cash Flows for Susan Desko, PC**

Given the nature of the business, Susan Desko, PC does not have separate Statement of Cash Flows. Please see Exhibit A-2.

**EXHIBIT A-4**

<u>**Statement of Changes in Member Equity for Susan Desko, PC**</u>

      Susan Desko, PC does not have a separate Statement of Changes in Member Equity. Please refer to the balance sheet, Exhibit A-1.

**EXHIBIT B**

**Description of Operation for Susan Desko, PC**

Susan Desko, PC is an architectural company. Its sole shareholder, Architect Susan Desko, AJA has practiced in Sun Valley, Idaho since 2000 developing unique, award winning homes. Recent projects have been completed in Seattle, Washington, and Ketchum, Idaho. These projects were designed and built in 2011 to 2018 and included interior design services. These projects are now complete. Susan Desko is presently in the process of completing the 29 Lake Creek project and developing additional clientele.

Source of information: based on the personal knowledge of Timothy Semones and Susan Desko, owners of Susan Desko, PC.

**EXHIBIT C**

**Description of Intercompany Claims**

There are no claims by Susan Desko, PC against any other Controlled Non-Debtor Entity.

Source of information: based on the personal knowledge of Timothy Semones and Susan Desko, owners of Susan Desko, PC.

**EXHIBIT D**

<u>**Allocation of Tax Liabilities and Assets**</u>

There are no tax sharing or tax allocation agreements by Susan Desko, PC to which the
entity is a party with any other Controlled Non-Debtor Entity.


Source of information: based on the personal knowledge of Timothy Semones and Susan Desko,
owners of Susan Desko, PC.

**EXHIBIT E**

**Description of Controlled Non-Debtor Entity's Payments of Administrative Expenses, Or
Professional Fees Otherwise Payable by Debtor**

There are no payments made, or obligations incurred (or claims purchased) by Susan
Desko, PC in connection with any claims, administrative expenses, or professional fees that have
been or could be asserted against any Debtor.

Source of information: based on the personal knowledge of Timothy Semones and Susan Desko,
owners of Susan Desko, PC.

# EXHIBIT F

**Chart of Creditors and projected length of Plan (Semones/Desko)**

| Creditor Name | Claim Amount | Source |
|---|---|---|
| American Express (9000) | $ 207,525.33 | Claim 4 |
| American Express (1008) | $ 12,945.82 | Claim 2 |
| Capital One | $ 2,645.68 | Claim 8 |
| Stapley Engineering | $ 14,278.00 | Schedule F |
| Wells Fargo (4366) | $ 19,563.02 | Claim 3 |
| Wells Fargo (8518) | $ 23,887.66 | Claim 10 |
| Andrew S. Pitt | $ 35,000.00 | Claim 6 |
| **TOTAL** $ | **315,845.51** | |

| | |
|---|---|
| Estimated repayment period (w/Semones income): | 53 months |
| Estimated repayment period (w/o 3 years Semones income): | 85 months |

Note: Repayment period assumes $65k payment from sale of vehicles

# EXHIBIT G

BART M. DAVIS, IDAHO STATE BAR NO. 2696
UNITED STATES ATTORNEY
RAYMOND E. PATRICCO, DISTRICT OF COLUMBIA STATE BAR NO. 454792
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
WASHINGTON GROUP PLAZA IV
800 EAST PARK BOULEVARD, SUITE 600
BOISE, ID 83712-7788
TELEPHONE: (208) 334-1211
FACSIMILE:  (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TIMOTHY SEMONES,<br><br>Defendant. | Case No.  1:20-CR-043-DCN<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

The United States of America, by and through Bart M. Davis, United States Attorney,

and the undersigned Assistant United States Attorney for the District of Idaho, submits the

following memorandum setting forth the government's position at sentencing.  The Government

agrees with the recommendation of the Probation Officer that the Court sentence the defendant to

a term of imprisonment of 41 months.  Further, the Government requests that the Court enter an

order of restitution to reflect the $3,000,000 loss to the victim (and also indicate that the

Defendant has paid restitution in full) and enter a preliminary order of forfeiture in the amount of

$191,841.54.

**GOVERNMENT'S SENTENCING MEMORANDUM - 1**

# BACKGROUND

In 2004, the Defendant incorporated Inphi Partners, LLC ("Inphi Partners"). In 2004, the Defendant, through Inphi Partners, purchased a parcel of land located at 29 Lake Creek Drive, Ketchum, Idaho. Subsequently, the Defendant began designing and building an approximate 7,000 square foot "dream house" for himself and his wife on the parcel.

In 2017 and 2018, the Defendant was employed as the Chief Financial Officer ("CFO") of ETA Compute, Inc. ("ETA"). The company was headquartered in Los Angeles, California, but the Defendant worked remotely from Ketchum, Idaho. As part of his duties as CFO, the Defendant had access to ETA's Wells Fargo Bank business checking account and had the ability to make online transfers of funds from this account.

Between in or about October 2017 and in or about November 2018, the Defendant embezzled from ETA to fund the construction of the residence at 29 Lake Creek Drive. Specifically, during this period, the Defendant made nine (9) online transfers of funds, totaling $3,000,000, from ETA's Wells Fargo Bank account to the Susan Desko, PC and Inphi Partners bank accounts over which he had access and control. The Defendant used the misappropriated funds to pay construction costs for the residence at 29 Lake Creek Drive, and to pay off the balance of a line of credit used to build the house.

In November 2018, ETA's Chief Executive Officer noticed a shortfall in ETA's Wells Fargo Bank account. When the CEO confronted the Defendant about the balance of funds in the account, the Defendant made false statements about the location and balance of funds. Further, the Defendant emailed falsified Wells Fargo Bank records – that made it appear that ETA's bank account had $1.5 million more than it actually did – to ETA's CEO. The CEO independently requested and received accurate bank records from Wells Fargo that proved the Defendant's lie.

**GOVERNMENT'S SENTENCING MEMORANDUM - 2**

When the CEO and another ETA employee confronted the Defendant with the accurate bank records, the Defendant admitted his embezzlement and that he had falsified the Wells Fargo Bank records.

In May 2018, the Defendant transferred $1,500,000 from his personal bank accounts to ETA, in partial repayment of the funds he embezzled.

On January 24, 2019, the Defendant and his wife, Susan Desko, filed a voluntary Chapter 11 Bankruptcy petition in United States Bankruptcy Court for the District of Idaho (19-40057-JMM). On April 23, 2019, ETA filed a nondischargeability adversary proceeding against the Defendant and his wife in the United States Bankruptcy Court for the District of Idaho (19-08028-JMM).

On December 20, 2019, in the bankruptcy case, ETA and the Defendant and his wife agreed to a proposed settlement agreement of the debt owed by the Defendant, including a settlement of the ETA adversary proceeding. Pursuant to the settlement agreement, the Defendant paid ETA $1,300,000 and surrendered his and his wife's stock in ETA in exchange for ETA fully releasing the Defendant and his wife from all lawsuits, levies, and judgments.

On May 1, 2020, the Defendant sold the 29 Lake Creek Drive property. From the proceeds of the sale, ETA received the $1,300,000 – and the Defendant surrendered his wife's stock to ETA – in the agreed-upon satisfaction of restitution due to ETA.

Further, on May 4, 2020, the remaining $191,841.54 of the proceeds of the sale was deposited in the United States Marshal's Service, Seized Assets Deposit Fund. This amount is derived from, and traceable to, the Defendant's embezzlement.

On August 25, 2020, pursuant to a written plea agreement, the Defendant pleaded guilty to count nine of the indictment, charging him with wire fraud. Pursuant to the plea agreement,

**GOVERNMENT'S SENTENCING MEMORANDUM - 3**

the Defendant and the Government agreed to recommend that the Court enter an order of

restitution to reflect the $3,000,000 loss to ETA, but also indicate the defendant has made full

restitution to ETA. Further, the Defendant agreed to forfeit the $191,841.54 to the Government.

## **LEGAL ANALYSIS**

The Ninth Circuit has set forth a basic framework that district courts should follow in

compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

(1) Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.

(2) Courts should then consider the § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. The guidelines are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

(3) If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

(4) Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008).

## **SENTENCING CALCULATION**

### **A.**  **Statutory Maximum and Minimum Sentence**

The Defendant stands convicted on one count of wire fraud, in violation of 18 U.S.C.

§ 1343. The statutory maximum for this count of conviction is 20 years imprisonment, a

$250,000 fine, and not more than 3 years of supervised release.

### **B.**  **United States Sentencing Guidelines Calculation**

"As a matter of administration and to secure nationwide consistency, the Guidelines

should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49

**GOVERNMENT'S SENTENCING MEMORANDUM - 4**

(2007).  The Probation Officer properly calculated a total offense level of 22 and a criminal history category of I, for a Guidelines range of 41 to 51 months imprisonment.  *See* PSIR at ¶ 52.

## IMPOSITION OF SENTENCE

### A.  Section 3553(a) Analysis

The Government agrees with the Probation Officer and recommends that the Court sentence the Defendant to 41 months of imprisonment, at the low-end of the Guidelines range. Further, the Government requests that the Court issue a restitution order that reflects the $3,000,000 in restitution due to ETA but recognizing that the Defendant has paid restitution in full to ETA.  Finally, the Government requests that the Court enter a preliminary order of forfeiture in the amount of $191,841.54.  As set forth below, this sentence is "sufficient, but not greater than necessary" to comply with the Section 3553(a) factors.  *See* 18 U.S.C. § 3553(a).

First, the Court's sentence should reflect that the Defendant committed a serious offense and provide just punishment therefor.  *See id.* at § 3553(a)(2)(A).  ETA trusted the Defendant as Chief Financial Officer, so much so that they allowed him to work remotely in Idaho and have full control over their bank accounts.  The Defendant abused this trust by embezzling $3,000,000 to build a dream house designed by his architect wife.  The embezzlement was perpetuated over the course of nearly four months.  Accordingly, it was premeditated and not aberrant.  Further, the Defendant compounded his theft by lying and fabricating documents.  When initially confronted by ETA's Chief Executive Officer, the Defendant lied to him about the company's bank account balance and provided him with falsified bank records to support the lie.

While it is true that the Defendant has refunded to ETA the approximate $3,000,000 he stole, he apparently did not do so without a fight.  And the $3,000,000 loss does not reflect the full impact of his offense on ETA.  Gopal Raghavan, ETA's Chief Executive Officer, explained:

> To hide his theft, [the Defendant] forced us into accepting a
> usurious loan from a lender at over 10% percent [sic] interest with
> no prepayment. He did this to avoid this theft being exposed. The
> company will continue paying this money through next year and
> this adds to our case burn by over $1.2M/year for over 3 years. . .
> His theft has had a major impact on our ability to raise more
> money from investors. Some investors refused to invest when we
> disclosed the theft to them. We have had to layoff half the
> company and despite that, our survival is in doubt. . . When his
> theft was caught, we had asked him to start returning some of this
> money in December 2018 as a sign of good faith. He refused to
> part with a dime. When we went to Court to force him to sell a
> few of his SEVEN cars, he spent money on attorneys to fight that
> motion that would have paid us about $70,000. He told us that this
> was his 'personal property' while the money he stole was 'business
> related' so he would not use his personal resources to pay us. . . In
> the same spirit, he had over $500,000 in his bank account in Dec
> 2018. He hid the money and used all legal moves at his disposal to
> avoid paying even a dime. He felt no remorse or no urge to make
> us whole throughout 2019. . . Only when the criminal case
> indictment happened in late 2019/early 2020, did he finally decide
> to sell the house to pay us off. I believe the only purpose of this
> was to claim to this Court that he made the company whole.

*See* Gov't Ex. A (Victim Impact Letter of Gopal Raghavan, Sept. 13, 2020). In addition to

demonstrating the full impact of the crime, the Defendant's machinations to delay repayment are

a measure of his character. *See* 18 U.S.C. § 3553(a)(1).

Second, the Court's sentence should reflect that the Defendant committed his offense

solely out of greed and opportunity, not necessity. *See id.* As Mr. Raghavan stated:

> [The Defendant] stole this money not out of necessity but for
> greed. I would be very sympathetic if he really needed this money.
> Unfortunately, this theft only served to support an extravagant
> lifestyle for his wife and him.

Gov't Ex. A.

The Defendant's history and characteristics support this. *See* 18 U.S.C. § 3553(a)(1). He

had a "normal Midwestern childhood" in a generally healthy and loving environment. PSIR at

¶ 39. He attended and graduated from excellent institutions of higher learning. *Id.* at ¶¶ 40, 47.

**GOVERNMENT'S SENTENCING MEMORANDUM - 6**

He has not history of mental, emotional, or substance abuse problems. *Id.* at ¶¶ 45-46. He

succeeded at the highest levels of business, earned high salaries for many years, and bought

numerous luxury vehicles. *Id.* at ¶¶ 48, 50. Other than arrests for driving under the influence, he

lived a law-abiding life. Simply, there is nothing in the Defendant's background that could have

predicted or necessitated this offense, other than greed.[1]

Finally, the Court's sentence should promote general deterrence. *See* 18 U.S.C.

§ 3553(a)(2)(B). White collar crimes, like the Defendant's embezzlement, are particularly

susceptible to general deterrence. That is because white collar criminals, oftentimes, premeditate

their crimes and engage in a cost-benefit analysis. *See, e.g., United States v. Martin*, 455 F.3d

1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool,

and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates

for general deterrence. Defendants in white collar crimes often calculate the financial gain and

risk of loss, and white collar crime therefore can be affected and reduced with serious

punishment."); *United States v. Bergman*, 416 F.Supp. 496, 500 (S.D.N.Y. 1976) ("[W]e

continue to include among our working hypotheses a belief (with some concrete evidence in its

---

[1] To the extent that the Defendant may argue for leniency due to the COVID-19 pandemic, and
his potential exposure to the disease in prison, the Court should not afford this argument much
weight. The Defendant is 60 years old and generally healthy. Indeed, other than high
cholesterol that he treats with medication, he reports no history whatsoever of serious medical
conditions. PSIR at ¶ 44. Further, the Defendant is no safer in the community than he will be in
prison. That is because Idaho (like other states) currently is suffering the worst spike in COVID-
19 cases since the onset of the pandemic. As this Court observed in the context of
compassionate release: "[m]ultiple courts have denied compassionate release to prisoners, even
those with high-risk medical conditions, because many of them would likely be less-exposed to
the pandemic by remaining at the prison." *United States v. Graf,* No. 4:18-cr-00141-DCN-1,
Mem. Decision & Order at 11-12 (D. Idaho June 25, 2020) (denying compassionate release to
defendant imprisoned at FCI Englewood and suffering from hypertension, coronary artery
conditions, obesity and MSRA) (citing cases). Accordingly, the Court should not hesitate to
sentence the Defendant to an appropriate prison term.

**GOVERNMENT'S SENTENCING MEMORANDUM - 7**

support) that crimes like those in this case [nursing home fraud] – deliberate, purposeful, continuing, non-impulsive, and committed for profit – are among those most likely to be generally deterrable by sanctions most shunned by those exposed to temptation.").

The certainty of significant prison sentences is most effective in deterring would-be white collar criminals, while insignificant sentences can have the opposite effect. *See, e.g., United States v. Cutler*, 520 F.3d 136, 163 (2d Cir. 2008) ("To the extent that the district court's views that this 'type' of offense did not warrant a long sentence and that the relative length of the sentence was relatively unimportant in providing deterrence were meant to apply to [defendant's] convictions for tax evasion and tax fraud conspiracy, the court's views were squarely contrary to the policy judgments articulated by the Sentencing Commission."). Accordingly, for the reasons set forth above, the Court should accept the recommendation of the Probation Officer and the Government and sentence the Defendant to a term of 41 months in prison.

**B.** **Application of the Guidelines in Imposing a Sentence under 18 U.S.C. § 3553(b)**

The Government's within-guidelines recommendation is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission, and serves the vital goal of uniformity and fairness in sentencing. The guidelines, formerly mandatory, now serve as one factor among several that courts must consider in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Nonetheless, "the Guidelines Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 108-09 (internal quotation marks omitted). Thus, "the Guidelines Commission's recommendation of a sentencing range will 'reflect a rough

**GOVERNMENT'S SENTENCING MEMORANDUM - 8**

approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The guidelines are the sole means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the § 3553(a) factors, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. Therefore, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

The guidelines deserve significant respect. The government recognizes that the guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. A district court, however, must consider the guidelines range, *see* § 3553(a)(4), and is usually well-advised to follow the Sentencing Commission's advice in order to assure fair, proportionate, and uniform sentencing of criminal offenders. Moreover, there are no other § 3553(a) factors in this case which mitigate against imposition of a sentence within that range; to the contrary, the § 3553(a) factors on balance support the imposition of the recommended guidelines sentence. Accordingly, the government recommends a within-guideline sentence of 41 months in prison.

## CONCLUSION

Application of 18 U.S.C. § 3553 supports a sentence of  months for the Defendant's commission of the crime of wire fraud. The government submits that a sentence of  months is sufficient, but not greater than necessary, to accomplish the goals of sentencing, and that a lesser sentence is not supported by application of the 18 U.S.C. § 3553(a) factors.

Respectfully submitted this  1st  day of December, 2020.

**GOVERNMENT'S SENTENCING MEMORANDUM - 9**

BART M. DAVIS
UNITED STATES ATTORNEY
By:

*/s/ Raymond E. Patricco*
Raymond E. Patricco
Assistant United States Attorney

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 1, 2020, the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| John David Merris<br>671 E. Riverpark Lane, Ste. 210<br>Boise, ID 83706<br>jmerris@earthlink.net | ☐ United States Mail,<br>☐ Fax<br>☒ ECF filing<br>☐ E-mail |

*/s/ Raymond E. Patricco*
Assistant United States Attorney

**GOVERNMENT'S SENTENCING MEMORANDUM - 11**

My name is Gopal Raghavan. I am one of the co-founders of Eta Compute and was the CEO from November 2015 to April 2019. I have known Tim since 1999 when we worked together to and started Inphi Corporation. Over the course of 10 years, we had many ups and downs in business, but we were eventually successful. I left Inphi in 2011 and founded Eta Compute in 2015. Despite a lot of push back from the investors on hiring Tim, I insisted on hiring him and making him a part of the founding team.

It was a real shock when I discovered in November 2018 that Tim betrayed my trust and stole money from the company. While he claims that he returned the money he stole, I want to enumerate how his actions resulted in ruining the effort of 25 of his friends and co-workers who spent days, weekends and night to try and make this company a success.

1. Tim stole this money not out of necessity but for greed. I would be very sympathetic if he really needed this money. Unfortunately, this theft only served to support an extravagant lifestyle for his wife and him.
2. To hide his theft, Tim forced us into accepting a usurious loan from a lender at over 10% percent interest with no prepayment. He did this to avoid this theft being exposed. The company will continue paying this money through next year and this adds to our cash burn by over $1.2 M / year for over 3 years.
3. His theft has had a major impact on our ability to raise more money from investors. Some investors refused to invest when we disclosed the theft to them. We have had to layoff half the company and despite that, our survival is in doubt.
4. When his theft was caught, we had asked him to start returning some of this money in December 2018 as a sign of good faith. He refused to part with a dime. When we went to Court to force him to sell a few of his SEVEN cars, he spent money on attorneys to fight that motion that would have paid us about $70,000. He told us that this was his "personal property" while the money he stole was "business related" so he would not use his personal resources to pay us.
5. In the same spirit, he had over $500,000 in his bank account in Dec 2018. He hid the money and used all legal moves at his disposal to avoid paying even a dime. He felt no remorse or no urge to make us whole throughout 2019.
6. Only when the criminal case indictment happened in late 2019/early 2020, did he finally decide to sell the house to pay us off. I believe the only purpose of this was to claim to this Court that he made the company whole.

In short, Tim has betrayed my trust and that of many of his close friends and colleagues by his greedy actions. Additionally, he showed no remorse nor was he interested in paying us when he was caught. I am happy to answer any questions that probation or the Court may have.

I want to point out these issues to the Court so that you can understand the impact of Tim's actions on many of us as you decide on the appropriate sentence.

Thank you for your consideration

Gopal Raghavan

September 13, 2020